97 F.3d 1187
 78 A.F.T.R.2d 96-6690, 65 USLW 2249,
96-2 USTC P 50,533,
20 Employee Benefits Cas. 1873,
Unempl.Ins.Rep. (CCH) P 15588B,
96 Cal. Daily Op. Serv. 7370,
96 Daily Journal D.A.R. 12,105,
Pens. Plan Guide P 23926U
 Donna VIZCAINO; Jon R. Waite; Mark Stout; Geoffrey
Culbert; Lesley Stuart; Thomas Morgan;
Elizabeth Spokoiny; Larry Spokoiny,
Plaintiffs-Appellants,
v.
MICROSOFT CORPORATION, and its pension and welfare benefit
plans, et al., Defendants-Appellees.
 No. 94-35770.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 18, 1995.
Decided Oct. 3, 1996.
 
 Stephen K. Strong and David F. Stobaugh, Bendich, Stobaugh & Strong, Seattle, WA, for plaintiffs-appellants.
 James D. Oswald and Timothy St. Clair Smith, Davies, Roberts & Reid, Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington, Carolyn R. Dimmick, District Judge, Presiding. D.C. No. CV-93-00178-CRD.
 Before: REINHARDT and TROTT, Circuit Judges, and SCHWARZER, District Judge.*
 Opinion by Judge REINHARDT; Dissent by Judge TROTT.
 REINHARDT, Circuit Judge:
 
 
 1
 Large corporations have increasingly adopted the practice of hiring temporary employees or independent contractors as a means of avoiding payment of employee benefits, and thereby increasing their profits. This practice has understandably led to a number of problems, legal and otherwise. One of the legal issues that sometimes arises is exemplified by this lawsuit. The named plaintiffs, who were classified by Microsoft as independent contractors, seek to strip that label of its protective covering and to obtain for themselves certain benefits that the company provided to all of its regular or permanent employees. After certifying the named plaintiffs as representatives of a class of "common-law employees," the district court granted summary judgment to Microsoft on all counts. The named plaintiffs and the class they represent now appeal as to two of their claims: a) the claim, made pursuant to section 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a), that they are entitled to savings benefits under Microsoft's Savings Plus Plan (SPP); and b) the claim, made pursuant to Washington state law, that they are entitled to stock-option benefits under Microsoft's Employee Stock Purchase Plan (ESPP). In both cases, the claims are based on their contention that they are common-law employees.
 
 
 2
 * Microsoft, one of the country's fastest growing and most successful corporations and the world's largest software company, produces and sells computer software internationally. It employs a core staff of permanent employees. It categorizes them as "regular employees" and offers them a wide variety of benefits, including paid vacations, sick leave, holidays, short-term disability, group health and life insurance, and pensions, as well as the two benefits involved in this appeal. Microsoft supplements its core staff of employees with a pool of individuals to whom it refuses to pay fringe benefits. It previously classified these individuals as "independent contractors" or "freelancers," but prior to the filing of the action began classifying them as "temporary agency employees." Freelancers were hired when Microsoft needed to expand its workforce to meet the demands of new product schedules. The company did not, of course, provide them with any of the employee benefits regular employees receive.
 
 
 3
 The named plaintiffs worked for Microsoft in the United States between 1987 and 1990 as freelancers in the company's international division.[1] Some were still working for the company when the suit was filed in 1993, and may still be doing so today. Although hired to work on specific projects, seven of the eight named plaintiffs had worked on successive projects for a minimum of two years prior to the time the action was filed, while the eighth had worked for more than a year. During that time, they performed services as software testers, production editors, proofreaders, formatters and indexers. Microsoft fully integrated the plaintiffs into its workforce: they often worked on teams along with regular employees, sharing the same supervisors, performing identical functions, and working the same core hours. Because Microsoft required that they work on site, they received admittance card keys, office equipment and supplies from the company.
 
 
 4
 Freelancers and regular employees, however, were not without their obvious distinctions. Freelancers wore badges of a different color, had different electronic-mail addresses, and attended a less formal orientation than that provided to regular employees. They were not permitted to assign their work to others, invited to official company functions, or paid overtime wages. In addition, they were not paid through Microsoft's payroll department. Instead, they submitted invoices for their services, documenting their hours and the projects on which they worked, and were paid through the accounts receivable department.
 
 
 5
 The plaintiffs were told when they were hired that, as freelancers, they would not be eligible for benefits. None has contended that Microsoft ever promised them any benefits individually. All eight named plaintiffs signed "Microsoft Corporation Independent Contractor Copyright Assignment and Non-Disclosure Agreements" (non-disclosure agreements) as well as companion documents entitled "Independent Contractor/Freelancer Information" (information documents) when first hired by Microsoft or soon thereafter. The non-disclosure agreement, a three-page document primarily concerned with confidentiality, included a provision that states that the undersigned "agrees to be responsible for all federal and state taxes, withholding, social security, insurance and other benefits." The information document likewise states that "as an Independent Contractor to Microsoft, you are self-employed and are responsible to pay all your own insurance and benefits." Eventually, the plaintiffs learned of the various benefits being provided to regular employees from speaking with them or reading various Microsoft publications concerning employee benefits.
 
 
 6
 In 1989 and 1990, the Internal Revenue Service (IRS) examined Microsoft's employment records to determine whether the company was in compliance with the tax laws. Applying common-law principles defining the employer-employee relationship, it concluded that Microsoft's freelancers were not independent contractors but employees for withholding and employment tax purposes, and that Microsoft would thereafter be required to pay withholding taxes and the employer's portion of Federal Insurance Contribution Act (FICA) tax.[2] Microsoft agreed to pay overdue employer withholding taxes and issue retroactive W-2 forms to allow the freelancers to recover Microsoft's share of FICA taxes, which they had been required to pay. It apparently also agreed to pay freelancers retroactively for any overtime they may have worked.
 
 
 7
 In response to the IRS rulings, Microsoft began "converting" its freelancers. That is, it tendered offers to some freelancers to become permanent employees; it gave other freelancers the option of terminating their employment relationship with Microsoft completely or continuing to work at the company but in the capacity of employees of a new temporary employment agency, which would provide payroll services, withhold federal taxes, and pay the employer's portion of FICA taxes. Most of the plaintiffs who were not given the opportunity to become permanent employees decided to become "temporary agency employees" rather than to be fired. However, Donna Vizcaino refused that option and was discharged. Those who elected "temporary employee status" noticed little change in the terms or conditions of their employment; they continued working the same hours on the same projects and under the same supervisors.
 
 
 8
 After learning of the IRS rulings, the plaintiffs sought various employee benefits, including those now at issue: the ESPP and SPP benefits. The SPP, which became effective January 1, 1987, is a cash or deferred salary arrangement under § 401k of the Internal Revenue Code that permits Microsoft's employees to save and invest up to fifteen percent of their income through tax-deferred payroll deductions. Under the plan, Microsoft matches fifty percent of the employee's contribution in any year, with a maximum matching contribution of three percent of the employee's yearly compensation. The ESPP, established in January, 1986, permits employees to purchase company stock at eighty-five percent of the lower of the fair market value on the first or on the last day of each six-month offering period through payroll deductions of from two to ten percent. Employees may purchase shares having a value not exceeding ten percent of their gross compensation for the offering period.
 
 
 9
 Microsoft rejected the plaintiffs' claims for benefits, maintaining that they were independent contractors who were personally responsible for all their own benefits. The plaintiffs sought review of the denial of benefits from the Microsoft plan administrator, who determined that the plaintiffs were ineligible because they contractually waived any rights to benefits and, in any event, they were not " 'regular, full time employees' in approved headcount positions." Although ruling "technically" only on the denial of ERISA benefits, the plan administrator concluded, for the same reasons, that the plaintiffs were ineligible to receive non-ERISA benefits.
 
 
 10
 The named plaintiffs brought this action, challenging the denial of benefits. Following cross-motions for summary judgment, the district court referred the matter to Magistrate Judge David E. Wilson, who recommended that an award be made in favor of the plaintiffs on both their SPP and ESPP claims. First, he concluded that the SPP was ambiguous with respect to whether it afforded coverage to the plaintiffs and that because the ambiguity could not be conclusively resolved by resort to extrinsic evidence, the doctrine of contra proferentem was applicable. Accordingly, he determined that the plan instruments should be construed in the plaintiffs' favor and recommended that the district court find that the plan afforded them coverage. Second, he concluded that by expressly adopting the conditions of the Internal Revenue Code, which permit tax qualification only to those plans that extend participation to all common-law employees, Microsoft had extended an offer of participation in the ESPP to all common-law employees, and that the plaintiffs fell into that category. Further, he found that although Microsoft had intended to exclude freelancers from participation in the ESPP, it had made the plaintiffs an offer in that plan and could not rely on their failure to accept it because it had incorrectly told them that they were ineligible to participate. Again, the magistrate judge recommended that the district court find that the plaintiffs were eligible for benefits.
 
 
 11
 The magistrate judge also made recommendations on several motions relating to benefits other than the SPP and ESPP. Specifically, he recommended denying the plaintiffs' motion for summary judgment in relation to vacation, sick leave, holidays, short-term disability, group health and life insurance, and granting Microsoft's motion for summary judgment on all claims governed by ERISA, except the SPP claim, and on all claims governed by state law, except the ESPP claim.
 
 
 12
 The district court adopted the magistrate judge's recommendations on all issues other than the SPP and ESPP claims. It rejected his recommendations as to those two claims and denied the plaintiffs' motion for summary judgment as to them, while granting Microsoft's. The district court first concluded that the SPP "clearly restricts participation to those individuals on Microsoft's payroll," that even if Microsoft could waive the argument that only employees paid through the payroll were eligible it had not done so, and that because the intent of the parties was to deny the plaintiffs participation, the terms of the plan were susceptible to only one reasonable interpretation. Thus, it said, the doctrine of contra proferentem was not applicable. Then, addressing the plaintiffs' eligibility to participate in the ESPP, the district court concluded:
 
 
 13
 First, the contract between Microsoft and the plaintiffs specifically stated that no benefits were provided by Microsoft. Second, because the terms of the plan were not communicated to the plaintiffs, they could not have become part of the contract between them and Microsoft. Thus, the plaintiffs had no expectation of receiving any benefits. Finally, as Microsoft asserts, I.R.C. § 423 does not create a private right of action by the plaintiffs against Microsoft.
 
 
 14
 The named plaintiffs and the class they represent appeal, but only with respect to the SPP and ESPP claims.
 
 II
 
 15
 ERISA is a remedial statute designed to protect the interests of employees in pension and welfare benefit plans. Scott v. Gulf Oil Corp., 754 F.2d 1499, 1501 (9th Cir.1985). It creates a federal cause of action for recovery of benefits due under the terms of pension and welfare plans. 29 U.S.C. § 1132(a)(1)(B).[3] Congress intended the courts to fashion a body of federal common law to govern ERISA suits. Richardson v. Pension Plan of Bethlehem Steel, 67 F.3d 1462, 1465 (9th Cir.1995); Scott, 754 F.2d at 1501-02. Courts, therefore, may borrow from state law where appropriate, but must be guided by the policies expressed in ERISA and other federal labor laws. Richardson, 67 F.3d at 1465; Scott, 754 F.2d at 1502.
 
 
 16
 The parties agree that the SPP is a welfare benefits plan governed by ERISA. See 29 U.S.C. § 1002(1)(A). They disagree, however, on the question whether the plaintiffs qualify for benefits under the terms of the plan. The SPP provides that "[e]ach employee who is 18 years of age or older and who has been employed for six months shall be eligible to participate in this Plan," and defines "employee" to mean "any common-law employee who receives remuneration for personal services rendered to the employer and who is on the United States payroll of the employer." (Emphasis added). Because the named plaintiffs were indisputably over eighteen years of age and were employed for more than six months, and because, as Microsoft concedes, they were generally common-law employees who rendered personal services to Microsoft,[4] the issue before us is only whether they were "on the United States payroll of the employer." Microsoft contends that the phrase, which is not defined in the plan, refers to employees paid through its payroll department, and that the named plaintiffs were ineligible to participate in the SPP because they were paid through the accounts receivable department. The plaintiffs assert that the phrase refers to "Microsoft employees who are paid from United States sources," excluding "nonresident alien employees of foreign subsidiaries whose pensions are generally governed by foreign law."
 
 
 17
 In the usual case, we review a denial of benefits challenged under section 1132(a)(1)(B) de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1388 (9th Cir.1994).[5] Where such discretion is afforded, the standard of review may vary with the type or nature of the plan. Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1474 (9th Cir.1993) (stating that we review decisions of administrators who are also employers of plan beneficiaries under " 'a more stringent version of the abuse of discretion standard' ") (citation omitted).
 
 
 18
 In the case before us, the administrator is a Microsoft officer. We need not, however, determine what standard would ordinarily be applicable to review of a denial of benefits under the SPP. For, while the plan gives the administrator discretion to construe its provisions, in denying the plaintiffs' claims the administrator did not construe the phrase "on the United States payroll of the employer," the phrase in the plan on which eligibility depends. Oddly, Microsoft did not raise its "United States payroll" theory before the plan administrator but argued it for the first time to the magistrate judge in the course of its motion for summary judgment.[6] The plaintiffs initially objected to consideration of the "United States payroll" argument because it did not appear in the administrative record, but then waived the objection and, like Microsoft, urged the magistrate judge and the district judge to address it. Both parties have consistently maintained that a remand to the plan administrator would serve no useful purpose. See CR Vol. 12, Document 152, at 22-23; CR. Vol. 12, Document 169, at 12 n. 11. Because both parties urged the district court, and now this court, to determine the meaning of the disputed provision, they have waived any possible objection to the failure to remand. Accordingly, we are free to decide Microsoft's latest argument in the normal course, as if the plan administrator had no discretion to construe the plan. Cf. Nelson, 37 F.3d at 1389 (holding that our review is de novo where the plan administrator, although having discretion to construe the plan, has not done so).[7]
 
 
 19
 We interpret the provisions of a plan by looking to its terms and to other manifestations of intent. Nelson, 37 F.3d at 1389. We interpret terms in ERISA plans " 'in an ordinary and popular sense as would a [person] of average intelligence and experience.' " Richardson, 67 F.3d at 1465 (quoting Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir.1990)); Babikian v. Paul Revere Life Ins. Co., 63 F.3d 837, 840 (9th Cir.1995); accord Meredith v. Allsteel, Inc., 11 F.3d 1354, 1358 (7th Cir.1993). " 'We will not artificially create ambiguity where none exists. If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy.' " Babikian, 63 F.3d at 840 (quoting Evans, 916 F.2d at 1441 (quoting Allstate Ins. Co. v. Ellison, 757 F.2d 1042, 1044 (9th Cir.1985))). We find "[a] term is ambiguous if it is subject to reasonable alternative interpretations." Hickey v. A.E. Staley Mfg., 995 F.2d 1385, 1389 (7th Cir.1993) (citation and internal quotation marks omitted); see Babikian, 63 F.3d at 840.
 
 
 20
 When a plan is ambiguous on its face, we may, and typically do, consider extrinsic evidence to interpret it. Richardson, 67 F.3d at 1466; Hickey, 995 F.2d at 1389. If the ambiguity persists even after resort to extrinsic evidence, we generally apply the rule of contra proferentem and construe the ambiguity against the drafter. See Barnes v. Independent Auto. Dealers of Cal., 64 F.3d 1389, 1393 (9th Cir.1995) ("We must construe ambiguities in an ERISA plan against the drafter and in favor of the insured."); Babikian, 63 F.3d at 840; Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 942 (9th Cir.1995) (noting that Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 539-41 (9th Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990), adopted the well-established doctrine of contra proferentem as federal common law).
 
 
 21
 Accordingly, our first task is to determine whether the phrase "on the United States payroll of the employer" is susceptible to more than one reasonable interpretation. In doing so, we must examine the phrase in light of any relevant circumstances that may shed light on its meaning. Here, the phrase is used in connection with a company that is engaged in a constantly expanding business venture of major proportions on a world-wide basis. Because "payroll" means "a list of persons to be paid, with the amount due each," or "the total number of people employed by a business firm or organization," Random House College Dictionary 976 (1980), the phrase "on the United States payroll of the employer," when accorded its ordinary meaning, may plausibly refer to those persons who are on the list of, or are among the total number of, persons employed by Microsoft and paid from its United States accounts, as opposed to those paid by its foreign subsidiaries or out of its foreign accounts. Thus, we believe that the plan, consistent with the ordinary meaning of its terms, reasonably can be read to extend eligibility to the plaintiffs.[8]
 
 
 22
 While an argument could well be made that the plaintiffs' is the only plausible reading of the plan, we choose not to rely on that assertion. Instead, we assume that Microsoft's interpretation is also a reasonable one, and accept its contention that the phrase could reasonably be construed to refer only to those employees paid through the payroll department. Assuming, then, that the terms of the SPP are susceptible to two reasonable interpretations and therefore are ambiguous, our next step is to determine whether the ambiguity can be resolved by resort to extrinsic evidence.
 
 
 23
 Microsoft contends that the extrinsic evidence, including the non-disclosure agreements and the information documents, demonstrates its intent not to provide freelancers or independent contractors with employee benefits and that this intent necessitates adoption of its interpretation of the disputed phrase. We have no doubt that the company did not intend to provide freelancers or independent contractors with employee benefits, and that if the plaintiffs had in fact been freelancers or independent contractors, they would not be eligible under the plan. The plaintiffs, however, were not freelancers or independent contractors. They were common-law employees,[9] and the question is what, if anything, Microsoft intended with respect to persons who were actually common-law employees but were not known to Microsoft to be such. The fact that Microsoft did not intend to provide benefits to persons who it thought were freelancers or independent contractors sheds little or no light on that question. To the extent that we may glean any evidence of an intent as to the more pertinent theoretical question, that evidence is highly speculative and would be insufficient to resolve in Microsoft's favor the ambiguity that it created when it chose to define eligibility in terms of common-law employees "on the United States payroll of the employer."
 
 
 24
 Microsoft also contends that extrinsic evidence establishes its intent to restrict eligibility to those common-law employees who were paid through the payroll department. It argues that compliance with relevant tax code provisions (I.R.C. §§ 401(k) & (m)) required computation of compensation, deferral, and matching contribution data, and that the necessary computations could practically be made only through its automated payroll department. It maintains that employees who were paid through the accounts receivable department, as opposed to the payroll department, could not be paid in a manner that would comply with IRS requirements and that, accordingly, it is clear that those employees were not intended to be covered in the plan.
 
 
 25
 Microsoft's argument, drawing a distinction between common-law employees on the basis of the manner in which they were paid, is subject to the same vice as its more general argument. Microsoft regarded the plaintiffs as independent contractors during the relevant period and learned of their common-law-employee status only after the IRS examination. They were paid through the accounts receivable department rather than the payroll department because of Microsoft's mistaken view as to their legal status. Accordingly, Microsoft cannot now contend that the fact that they were paid through the accounts receivable department demonstrates that the company intended to deny them the benefits received by all common-law employees regardless of their actual employment status. Indeed, Microsoft has pointed to no evidence suggesting that it ever denied eligibility to any employees, whom it understood to be common-law employees, by paying them through the accounts receivable department or otherwise.
 
 
 26
 In any event, to interpret the SPP as distinguishing between common-law employees who were paid through the payroll department and those who were not would impute to Microsoft an unlawful purpose: to pay some common-law employees without making the requisite payroll deductions and contributions, the very tax violation that subsequently engendered this litigation. We should not, if at all possible, favor an interpretation that has such an unlawful effect, and we see no reason to do so here. See Meredith v. Allsteel, Inc., 11 F.3d 1354, 1358 (7th Cir.1993) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]") (citation and internal quotation marks omitted). Thus, the extrinsic evidence on which Microsoft relies does not resolve the ambiguity in its favor.
 
 
 27
 In light of the rule of contra proferentem, the plaintiffs would prevail whether the extrinsic evidence supported their interpretation of the disputed phrase or whether the extrinsic evidence on which they rely was also deemed immaterial. For purposes of our disposition, we may assume the latter to be the case. With that assumption in mind, we find, as did the magistrate judge, that "the correct meaning of the terms in question, given the record and the agreed upon facts in this case, cannot be determined by resort to the extrinsic evidence," and that, therefore, the rule of contra proferentem is applicable.
 
 
 28
 Microsoft contends that the rule of contra proferentem should not be applied in this case because it has been applied generally in ERISA cases only for the purpose of granting benefits under insurance contracts. Microsoft is incorrect. It is true that the rule of contra proferentem, which is strictly applied in the interpretation of insurance contracts, is not automatically applied to all other contracts. Eley v. Boeing Co., 945 F.2d 276, 280 (9th Cir.1991). We have declined to apply the rule to "ERISA plans that are the product of collective bargaining agreements reached after arms-length bargaining between parties of equal power." Patterson v. Hughes Aircraft Co., 11 F.3d 948, 950 n. 3 (9th Cir.1993); see Eley, 945 F.2d at 280 (distinguishing Kunin because the plan was the result of a collective bargaining agreement); see also Kunin, 910 F.2d at 540. This case does not involve such a plan, and we see no reason to create a new exception to the rule we generally follow in ERISA cases. See Barnes, 64 F.3d at 1393.
 
 
 29
 We have also held that when an administrator has exercised his discretion to construe a plan pursuant to discretionary authority vested in him by the plan, we will not apply the rule of contra proferentem in our review of his discretionary ruling. Winters v. Costco Wholesale Corporation, 49 F.3d 550, 554 (9th Cir.1995). Microsoft argues that this case falls within this exception. Clearly, it would be inconsistent to review under an abuse of discretion standard and then to apply the rule of contra proferentem. However, as we explained earlier, the administrator did not construe the disputed terms of the plan, and therefore our review is de novo. When we review under a de novo standard, there is no similar inconsistency, and thus no reason not to apply the rule of contra proferentem.
 
 
 30
 Accordingly, we agree with the magistrate judge, who concluded that Microsoft, "[a]s the drafter of the plan, ... could easily have accomplished the limitation it now urges through the use of more explicit language...." We therefore construe the ambiguity in the plan against Microsoft and hold that the plaintiffs are eligible to participate under the terms of the SPP. We note that in doing so, we construe the phrase "on the United States payroll of the employer" in the manner we believe to be the most plausible anyway. Put more directly, were we not to apply the rule of contra proferentem, but simply to select the more reasonable of the competing interpretations, we would read the disputed phrase as do the plaintiffs. Thus, we would conclude in any event that the plan must be construed as extending participation to all persons employed by Microsoft and paid from its United State accounts, and not as excluding from participation those employees who are paid through the accounts receivable department rather than the payroll department.
 
 III
 
 31
 The parties agree that the plaintiffs' claims for stock-option benefits under the ESPP are not subject to ERISA but rather are governed by Washington state law. The plaintiffs contend that the ESPP, through its incorporation of § 423 of the Internal Revenue Code, extended eligibility to participate in the plan to all common-law employees, including themselves, and that they were therefore entitled to exercise the options. Microsoft contends that the plaintiffs are not entitled to ESPP benefits because: (1) the plaintiffs have no right to enforce § 423; (2) the plaintiffs signed instruments stating that they would receive no benefits; and (3) the ESPP was never communicated to the plaintiffs, and they therefore did not rely on the offer in continuing their employment. We address these contentions in turn.
 
 
 32
 First, we hold that the named plaintiffs and the class they represent are covered by the specific provisions of the ESPP. We apply the "objective manifestation theory of contracts," which requires us to "impute an intention corresponding to the reasonable meaning of a person's words and acts." Multicare Medical Ctr. v. DSHS, 114 Wash.2d 572, 790 P.2d 124, 133 (1990). Through its incorporation of the tax code provision into the plan, Microsoft manifested an objective intent to make all common-law employees, and hence the plaintiffs, eligible for participation. The ESPP specifically provides:
 
 
 33
 It is the intention of the Company to have the Plan qualify as an "employee stock purchase plan" under Section 423 of the Internal Revenue Code of 1954. The provisions of the Plan shall, accordingly, be construed so as to extend and limit participation in a manner consistent with the requirements of that Section of the Code.
 
 
 34
 (Emphasis added). The requirements of § 423 dictate that "options are to be granted to all employees of any corporation whose employees are granted any of such options by reason of their employment by such corporation." 26 U.S.C. § 423(b)(4). Because the term "employees" in § 423 is construed to refer to "common-law employees,"[10] the ESPP, when construed in a manner consistent with the requirements of § 423, extends participation to all common-law employees not covered by one of the express exceptions set forth in the plan.[11] Accordingly, we find that the ESPP, through its incorporation of § 423, expressly extends eligibility for participation to the plaintiff class and affords them the same options to acquire stock in the corporation as all other employees.
 
 
 35
 Microsoft argues that § 423 does not grant the plaintiffs a private right of enforcement. We conclude, as did the magistrate judge, that Microsoft's argument is without merit. This case is not about a private right of action. It is about the construction of the terms of a plan. As the magistrate judge cogently stated,
 
 
 36
 Plaintiffs do not contend that § 423, per se, provides them with a private right of enforcement. What they do contend is that Microsoft expressly incorporated § 423's terms into its ESPP, thereby making an offer to its employees, including its "common law employees," a classification in which they belonged.
 
 
 37
 Because the plan, properly construed, extends participation to all common-law employees, the plaintiffs may enforce the plan in the same manner as would any of Microsoft's other employees. They may, and did, assert a cause of action for breach of contract, not for violation of the Internal Revenue Code.[12]
 
 
 38
 Microsoft next contends that the non-disclosure agreements and the information documents signed by the plaintiffs render them ineligible to participate in the ESPP. First, the label used in the instruments signed by the plaintiffs does not control their employment status.[13] Second, the employment instruments, if construed to exclude the plaintiffs from receiving ESPP benefits, would conflict with the plan's express incorporation of § 423. Although Microsoft may have generally intended to exclude individuals who were in fact independent contractors, it could not, consistent with its express intention to extend participation in the ESPP to all common-law employees, have excluded the plaintiffs. Indeed, such an exclusion would defeat the purpose of including § 423 in the plan, because the exclusion of common-law employees not otherwise excepted would result in the loss of the plan's tax qualification.
 
 
 39
 Moreover, we find nothing inconsistent between the employment instruments signed by the plaintiffs, and an offer of participation in the ESPP. The statements in those instruments that speak in terms of the employee being "responsible for ... other benefits" or "responsible to pay all [his] own insurance and benefits" apply most naturally to health and welfare benefits, or similar employee protection policies, which an employee would have to pay on his own if the employer did not provide the benefits. In fact, we find the instruments fully consistent with the plaintiffs' participation in the ESPP, because, under the terms of the plan, it is the employee who makes the stock option payment, not Microsoft. Thus, it is the employee who is "responsible" for paying for the benefit. Accordingly, even if the incorporation of § 423 did not override the instruments signed by the plaintiffs, we would conclude that nothing in those instruments serves to waive or otherwise foreclose the plaintiffs' eligibility for participation in the ESPP.[14]
 
 
 40
 Finally, Microsoft maintains that the plaintiffs are not entitled to ESPP benefits because the terms of the plan were never communicated to them and they were therefore unaware of its provisions when they performed their employment services. As a preliminary matter, we find Microsoft's reliance on policy manual cases such as Kimbro v. Atlantic Richfield Company, 889 F.2d 869, 879 (9th Cir.1989), to be misplaced. In Kimbro, we stated that under Washington precedent, an employer may be contractually bound by promises in employee handbooks or manuals to provide specific treatment in specific situations only if an employee can show that the promise induced his reliance--that is, "that the promise induced him to remain on the job or not seek other employment." 889 F.2d at 879 (quoting Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081, 1088 (1984)). However, many policy manuals are primarily designed for internal guidance and such manuals are far different in nature and legal effect than tax-qualified benefit plans that fix the rights of their beneficiaries.[15]
 
 
 41
 In any event, to the extent that knowledge of an offer of benefits is a prerequisite, it is probably sufficient that Microsoft publicly promulgated the plan. In Dangott v. ASG Industries, Inc., 558 P.2d 379, 382 (Okla.1976), the plaintiff was unaware of the company's severance plan until shortly before his termination. The Oklahoma Supreme Court concluded nonetheless that publication of the plan was "the equivalent of constructive knowledge on the part of all employees not specifically excluded." Id. at 383 (emphasis added).[16] Here, the plaintiffs knew of the plan but were wrongly told by Microsoft that it did not apply to them. We are not aware of any Washington case involving a similar set of circumstances, but think it likely that if presented with the question, the Washington Supreme Court would adopt the Dangott approach, at least under the circumstances presented in this case.
 
 
 42
 Microsoft itself recognizes "the key distinction between offers actually made to a class of employees, as to which some courts enforce the offer on behalf of any class member, regardless of individual knowledge of the offer, and plans as to which no offer is made to the class, and the class is expressly notified no offer is being made." (Emphasis added). Here, the plan was distributed to Microsoft employees generally. By its terms, the plan extends participation to the class of common-law employees, and hence offers ESPP benefits to all members of that class.[17] Thus, applying the "key" distinction recognized by Microsoft, an offer was actually made to a class of employees of which the plaintiffs were a part, and it may be enforced on their behalf regardless of their individual knowledge regarding the offer.
 
 
 43
 We are not required to rely, however, on the Dangott analysis or even on Microsoft's own unwitting concession. There is a compelling reason, implicit in some of the preceding discussion, that requires us to reject the company's theory that the plaintiffs' entitlement to ESPP benefits is defeated by their previous lack of knowledge regarding their rights. It is "well established" that an optionor may not rely on an optionee's failure to exercise an option when he has committed any act or failed to perform any duty "calculated to cause the optionee to delay in exercising the right." 17A Am.Jur.2d Contracts § 85 (1991 & Supp.1996). "[T]he optionor may not make statements or representations calculated to cause delay, [or] fail to furnish [necessary] information...." Id. Similarly, "[I]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." Highlands Plaza, Inc. v. Viking Investment Corp., 72 Wash.2d 865, 435 P.2d 669, 676 (1967) (quoting 5 Williston on Contracts § 677 (3d ed. 1961)); James S. Black & Co. v. P & R Co., 12 Wash.App. 533, 530 P.2d 722, 724 (1975) (same); Refrigeration Eng'g Co. v. McKay, 4 Wash.App. 963, 486 P.2d 304, 309 (1971) (same); see Restatement of Contracts § 295 (1932).
 
 
 44
 Applying these principles, we agree with the magistrate judge, who concluded that Microsoft, which created a benefit to which the plaintiffs were entitled, could not defend itself by arguing that the plaintiffs were unaware of the benefit, when its own false representations precluded them from gaining that knowledge. Because Microsoft misrepresented both the plaintiffs' actual employment status and their eligibility to participate in the ESPP, it is responsible for their failure to know that they were covered by the terms of the offer. It may not now take advantage of that failure to defeat the plaintiffs' rights to ESPP benefits. Thus, we reject Microsoft's final argument.
 
 CONCLUSION
 
 45
 For the reasons stated, the district court's grant of summary judgment in favor of Microsoft and denial of summary judgment in favor of the plaintiffs is REVERSED and the case REMANDED for the determination of any questions of individual eligibility for benefits that may remain following issuance of this opinion and for calculation of the damages or benefits due the various class members.
 
 
 46
 REVERSED and REMANDED.
 
 TROTT, Circuit Judge, dissenting:
 
 47
 * The Savings Plus Plan
 
 
 48
 Microsoft has a payroll department, and it has a separate accounts payable department. Because these plaintiffs were regarded both by Microsoft and by themselves as independent contractors or freelancers, Microsoft did not budget or pay for them through the payroll department, but through the accounts payable department. This commonplace distinction is fatal to the plaintiff's request for Savings Plus Plan ("SPP") benefits because to be eligible for these benefits, they have to have been on the employer's "payroll." The Plan itself so states.
 
 
 49
 As freelancers, the plaintiffs worked for Microsoft with the clear understanding that they were not entitled to the benefits they now seek. They knew Microsoft paid them based on the submission of invoices and out of accounts payable. Nevertheless, they now contend-without a foot to stand on-that they were indeed on Microsoft's "payroll" and thus eligible for SPP benefits. In my reading of this record, they were not on Microsoft's "payroll," period. I agree with the district court's analysis. All this may seem formalistic to the casual reader, but it was an important distinction to Microsoft, and to these workers when they agreed as freelancers to perform work for this company.
 
 
 50
 How the plaintiffs got on Microsoft's payroll budget from the accounts payable department is a strange tale based not on the facts, but on an immaculate patching together by the majority of a series of interpretations, constructions, presumptions, plausibilities, assertions, and assumptions, topped off by an irrelevant definition of "payroll" in a Random House dictionary. This amalgam is driven in turn by an IRS ruling that the majority takes way beyond its necessary reach. The majority's strained and Urbanesque journey belies its claim that it does not create ambiguity where none exists. In the context of this case-forget Random House-"payroll" has an ascertainable meaning illustrated in large measure by the existence in Microsoft of an alternative method of paying people for their work: out of accounts payable. Anyone familiar with business is familiar with this distinction. Where is the ambiguity but in the eyes of uninitiated outsiders? I discern none, and the plaintiffs saw none either when they voluntarily worked under these circumstances.
 
 
 51
 As the majority indicates, we interpret terms in ERISA plans "in an ordinary and popular sense as would a person of average intelligence and experience," but we should do so with an eye to what those hypothetical people actually know (e.g., that they did not bargain for the payroll benefits they now seek). To do otherwise is to engage in head-in-the-sand thinking. All the maxims invoked by the majority to support their holdings are useless unless they square with the facts. If I know I have a "no benefits" contract, for example, what good does it do to ask what the ordinary average Babbitt (George, not Bruce) might believe after reading a Random House dictionary? These plaintiffs were university-educated. One had a law degree. They knew what they were getting into, and contra proferentem should not suggest otherwise. The majority's preference for answering this issue as a theoretical rather than a real question is wrong.
 
 
 52
 But for the sake of argument, we can ignore the contextual definition of "payroll" and concede the existence of an ambiguity created by the words "United States." Then we can examine extrinsic evidence to see if the plaintiffs have a righteous claim to this benefit. Here, their argument becomes tenuous in the extreme. The plaintiffs have not presented a shred of relevant extrinsic evidence that would justify their belief (after signing the documents they did and after accepting the contractual relationship governing this case) that they were on the payroll and entitled to any of the payroll benefits of regular employees, including the SPP. Plaintiff Vizcaino's answers in her deposition testimony, answers representative of the testimony of all plaintiffs, adequately illustrate this point:
 
 
 53
 Q. You didn't ask anything [during your initial interview] about the benefits on this job?
 
 
 54
 A. Well, yeah, I must have I guess. I don't remember what we said but, I guess it-- yeah, we weren't going to get benefits at that time.
 
 
 55
 Q. Okay. And just so we understand each other, when you say benefits-let me rephrase the question. By benefits I assume that you mean, and correct me if I'm wrong, things like holidays, vacation, sick leave, other kinds of paid leave, participation in the employee stock purchase plans, that kind of thing. Is that the way you mean benefits?
 
 
 56
 A. Yeah.
 
 
 57
 Q. Okay. Now, at the end of this conversation, this interview with Ms. Carter, I assume it was at the end of the conversation, did you accept the position on the terms that had been discussed in that interview?
 
 
 58
 A. Yes.
 
 
 59
 (emphasis added). Equally telling is the deposition testimony of plaintiff Culbert:
 
 
 60
 Q. Did you ever hear anybody use the term "regular employee" during your time at Microsoft when you were a freelancer?
 
 
 61
 A. I do recall, yes.
 
 
 62
 Q. And when that term was used did you understand it to refer to people who were salaried as opposed to freelancers?
 
 
 63
 A. Yes.
 
 
 64
 Q. So that until this status change [when Culbert became a regular employee] in October of 1989 you were never a regular employee at Microsoft?
 
 
 65
 A. I worked at Microsoft consistently.
 
 
 66
 Q. But you were never what was referred to as a regular employee?
 
 
 67
 A. That's correct. I was never what was referred to as a regular employee at that time, correct.
 
 
 68
 Q. And I take it at no time before October of 1989 did you ever apply for benefits of any type from Microsoft: sick leave, vacation, holidays, participation in the employee stock purchase program?
 
 
 69
 A. I didn't apply for those things.
 
 
 70
 * * * * * *
 
 
 71
 Q. But during the course of the next few weeks or months [after beginning work at Microsoft] it became clear to you that being a freelancer meant that you got no benefits?
 
 
 72
 A. That it meant something, if I may, it meant that in some ways I was different from the regular salaried employees with whom I worked.
 
 
 73
 Q. But among those ways of which it made [sic] you different was that you got no benefits?
 
 
 74
 A. Correct.
 
 
 75
 (emphasis added). In the light of this testimony, this case becomes just another example of litigants trying to force their feet into glass slippers that do not fit. As the magistrate judge correctly observed, these plaintiffs had express contracts for "no benefits."Why they would accept such an arrangement without benefits is also clear from the record: Microsoft paid them more cash on an hourly basis than regular employees. Plaintiff Culbert explains:
 
 
 76
 Q. Did you have any understanding at that time [when you became a regular employee of Microsoft] about whether it was common for freelancers to be making more on an hourly basis than the equivalent hourly rate for people who were regular salaried employees?
 
 
 77
 A. Yes.
 
 
 78
 Q. What was your understanding?
 
 
 79
 A. That in general freelance production editor [sic] on a gross cash basis would stand to make more than a regular staff employee.
 
 
 80
 Nevertheless, the plaintiffs brought this lawsuit pursuing not only SPP and stock purchase benefits, but vacation, sick leave, holidays, short-term disability, and group health and life insurance as well, i.e., the best of both worlds.
 
 
 81
 With all respect to my colleagues, their atmospheric use of the IRS's determination to shore up their analysis by suggesting Microsoft is a tax cheat is gratuitous and inappropriate. I do not discern on the part of Microsoft an unlawful purpose to violate the tax laws. What the IRS does for the purpose of collecting its due-both early and from the most reliable pocket-need not cast a dark light on a relationship with which both Microsoft and these employees were comfortable. It simply does not follow either from the IRS's ruling or from Microsoft's compliance with it (1) that these plaintiffs were payroll employees or (2) that to deny the plaintiffs' claim gives Microsoft unacceptably unclean hands. To quote the United States General Accounting Office in June of 1996,
 
 
 82
 [M]any employers struggle in making the [employee/independent contractor] classification decision because of the unclear rules. Until the classification rules are clarified, we are not optimistic that the confusion over who is an independent contractor and who is an employee can be avoided. The Treasury Department characterized the situation in 1991 in the same terms as it used in 1982; namely, that "applying the [20 factor] common law test in employment tax issues does not yield clear, consistent, or satisfactory answers, and reasonable persons may differ as to the correct classification."[1]
 
 
 83
 As the magistrate judge observed, "[p]laintiffs concede that the IRS ruling ... is in no way binding on this court." The IRS's familiar aggressive tax collection position and Microsoft's payroll argument can exist independently of each other without doing violence to the law.[2]
 
 
 84
 By tone and by choice of words the majority seems subtly to accuse Microsoft of reprehensible conduct towards its workers. Microsoft is identified as "refusing" to pay its workers fringe benefits as though it did something wrong in creating the contractual relationships in this case. Later in the opinion the majority charges Microsoft with "misrepresenting" to the plaintiffs their employment status and with taking advantage of them. They clothe Microsoft with a Dickensian anti-labor attitude. Such characterizations spring full-bloom from the first sentence of the majority's opinion where "avoiding payment of employee benefits" and "increasing profits" foreshadow the negative coloration of the infidel Microsoft's role in this drama. The majority's tone and accusations go against the factual record as developed and described by the magistrate judge in his Report and Recommendation dated April 15, 1994:
 
 
 85
 Plaintiffs offer the explanation that Microsoft really knew all along that they were regular "employees" entitled to benefits, and hid this entitlement from them by "mislabelling" them as independent contractors or freelancers. This argument is not persuasive. "Mislabelling" as used by Plaintiffs implies a unilateral act by Microsoft which in some way hid their true status from Plaintiffs. In truth, Microsoft was quite open about the terms of its working relationships with Plaintiffs on the subject of employee benefits and each of the Plaintiffs fully understood and accepted those terms.
 
 
 86
 (emphasis added).
 
 
 87
 Neither federal nor state law mandates the benefits sought, nor does the applicable collective bargaining agreement. Microsoft was free to offer the benefits in return for work as Microsoft saw fit. Thus, the majority seems to overlook the constitutional right of private parties freely to enter into contracts of their own choice and benefit. It is not for the courts under these circumstances to add clauses to agreements that the parties never contemplated, or to accuse parties of attitudes and behavior of which they are not guilty. Congress designed ERISA to protect benefits workers already had, not to give them benefits for which they did not contract. See 18 U.S.C. § 1001 (Congressional findings and declaration of policy).
 
 II
 The Employee Stock Purchase Plan
 
 88
 The plaintiffs' second claim of entitlement is to stock option benefits under Microsoft's Employee Stock Purchase Plan ("ESPP"), a claim we process under the law of the State of Washington. The law in question is the Washington law of contracts.
 
 
 89
 As with the plaintiffs' first claim, the majority engages in analytical gymnastics to find a contractual right where none exists. No one disputes that the offer made by Microsoft and accepted by the plaintiffs explicitly excluded the ESPP benefits now sought. Plaintiffs freely admit as demonstrated earlier that they never expected when these contracts were formed to receive any such benefits. Microsoft never offered the benefits to the plaintiffs, either bilaterally or unilaterally, the plaintiffs never accepted them, and the plaintiffs never relied on them in any way whatsoever as part of their compensation package. As the magistrate judge found in his Report and Recommendation,
 
 
 90
 Microsoft indeed offered such benefits to its "regular employees" and described them in employee handbooks issued to regular employees, but not to freelancers. Moreover, it is not contended by any Plaintiff that he/she was ever offered such benefits by any Microsoft spokesperson, or even a handbook, and to the extent that any of them saw the books, they understood that they were not entitled to them.
 
 
 91
 Thus, without an offer, without acceptance, without consideration, and without a meeting of the minds, the majority creates by operation of law a contractual right on behalf of these plaintiffs that they never even contemplated until this lawsuit began.
 
 
 92
 This unpredictable result is so radical that it trespasses on Article I, section 10, Clause 1 of the Constitution, which prohibits a state from impairing the obligation of contracts. Neither through legislation nor by judicial act could a state severely transmogrify a contractual obligation in this manner and force one party to it to confer such benefits on the other. The result in this case resembles the thrust of the Minnesota statute struck down by the Supreme Court in Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). In that case, Minnesota had enacted a law requiring certain private employers who provided pension benefits under a plan meeting the qualifications of section 401 of the Internal Revenue Code to provide pension benefits "conspicuously beyond those that [the company] had voluntarily agreed to undertake." Id. at 240, 98 S.Ct. at 2720. The Supreme Court held this statute unconstitutional under the contracts clause (1) because it failed to deal with a "broad, generalized economic or social problem," and (2) because of its narrow aim at only certain employers. The Court noted also in the employer's favor (1) that the employees of Allied Structural never relied on the statutory benefit at issue, and (2) that the statute "compelled the employer to exceed bargained-for expectations and nullified an express term of the pension plan." Id. at 246 n. 18, 98 S.Ct. at 2723 n. 18. Justice Stewart said,
 
 
 93
 The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.
 
 
 94
 Id. at 245, 98 S.Ct. at 2723.[3] Because we are bound to apply state law to this dispute, we have no authority to impair the obligation of these contracts either. To do so is tantamount to depriving Microsoft of property without due process of law.
 
 CONCLUSION
 
 95
 The IRS's understandably tough enforcement program not only collects more money for the government, but it now has the unforeseen and unnecessary consequence of forcing employers retroactively to extend to workers optional benefits for which they did not contract. I perceive no need whatsoever to permit the IRS's ruling to spill out of its unique context and to do damage to contracts between companies and workers. The ruling and the contracts can exist independently of each other. Peaceful coexistence simply means that all workers will be made to pay their taxes, no more, no less, and that all workers will get that for which they bargained. Thus, I respectfully dissent.
 
 
 
 *
 The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The district court certified a class comprising
 [a]ll persons employed by Microsoft Corporation in the United States who are denied employee benefits because they are considered independent contractors or employees of third-party employment agencies, but who meet the definition of employees of Microsoft Corporation under the common law.
 Microsoft did not object to the class certification or contest the determination that freelancers or independent contractors are proper class members but sought to reserve the question as to whether certain specific individuals fell within the class as well as the question of the amounts due class members by way of benefits or damages. See ER at 27. See also infra n. 4.
 
 
 [2]
 "[B]ased on information received from Microsoft and on information received from a representative sampling of the workers in that job position," the IRS concluded in one of several letter rulings that because "Microsoft either exercised, or retained the right to exercise, direction over the services performed," those persons employed as testers were employees of Microsoft "for purposes of the Federal Insurance Contribution Act, the Federal Unemployment Tax Act, and for Collection of Income Tax at the Source on Wages." The IRS issued similar findings regarding formatters, proofreaders, and production editors
 
 
 [3]
 Section 1132(a)(1)(B) provides, in pertinent part, that a "civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of the plan...." (Emphasis added)
 
 
 [4]
 As the magistrate judge stated in his Report and Recommendations, Microsoft conceded the fact that the named plaintiffs and the class they represent generally were common-law employees. ER at 144, 147-48. See also supra n. 1. Microsoft reserved only the right to object to the employment status of particular plaintiffs during certain periods of their tenure with Microsoft and to contest the amount of damages or benefits to be awarded. CR Vol. 12, Document 152, at 9 n. 5. For example, Microsoft stated that "for some period of time, Plaintiff Morgan performed proofreading services from his home, with an uncertain amount of supervision." Id. Questions raising legitimate disputes regarding specific individuals' eligibility are left to the district court for resolution following remand
 
 
 [5]
 When the plan does not grant the plan administrator discretion to construe its provisions, the district court reviews de novo, and our review is also de novo. Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 942 (9th Cir.1995)
 
 
 [6]
 Microsoft prevailed before the plan administrator on the theory that the plaintiffs were not "regular, full-time employees" in "approved headcount positions," a theory that it has since abandoned
 
 
 [7]
 This case is not controlled by Saffle v. Sierra Pacific Power Company, 85 F.3d 455 (9th Cir.1996). There, we held that where a plan administrator misconstrues a plan, the court should not determine whether benefits are to be awarded under a proper construction; instead, it should remand to the plan administrator for it to make a determination under the plan, properly construed. Here, the term that determines the plaintiff's eligibility was not construed at all by the plan administrator. More important, both parties have agreed that a remand would be inappropriate. The parties are, of course, free to waive any right they may have to a construction by a plan administrator
 
 
 [8]
 There may be a slight variation on the interpretation set forth above that is equally plausible and would similarly serve to extend eligibility to the plaintiffs. Under that variation, the disputed phrase would be construed as referring to all persons employed by Microsoft in the United States. However, we need not examine that possibility here
 
 
 [9]
 The instruments signed by the plaintiffs label them as independent contractors. Those instruments, however, do not control the plaintiffs' employment status. See Daughtrey v. Honeywell, 3 F.3d 1488, 1492 (11th Cir.1993) ("The employment status of an individual for the purposes of ERISA is not determined by the label used in the contract between the parties."). Accordingly, the label used here does not determine whether the plaintiffs are or are not common-law employees. The record does, and as Microsoft has conceded, the named plaintiffs and those they represent are generally common-law employees
 
 
 [10]
 Treasury Regulation § 1.423-1(b) cross-references § 1.421-7(h) for rules relating to the employment relationship. That subsection, in turn, provides that the determination whether an optionee is an employee will be made in accordance with § 3401(c)-1(a), which states that the term "employee" includes every individual performing services for another where the legal relationship between the two is that of employer and employee. Section 31.3401(c)-1(b) summarizes the common-law test of employee, and § 31.3401(c)-1(c) provides that where the legal relationship exists, the labels used by the parties to describe the relationship are of no consequence
 
 
 [11]
 Section 423(b)(4) sets forth four express exceptions. The ESPP incorporates two of them, as follows:
 [a]ny employee of the Company or any of its subsidiaries who is in the employ of the Company at one of the offering dates is eligible to participate in the Plan, except (a) employees whose customary employment is 20 hours or less per week, and (b) employees whose customary employment is for not more than five months in the calendar year.
 The plaintiffs fit neither of these exceptions.
 
 
 [12]
 A similar approach obtains with respect to plans that require compliance with the provisions of ERISA. While Internal Revenue Code provisions and Treasury regulations do not create substantive rights under ERISA, if an ERISA plan explicitly provides that it is to be construed to meet such provisions, courts look to them in determining employee eligibility for participation in the plan. See Crouch v. Mo-Kan Iron Workers Welfare Fund, 740 F.2d 805, 809 (10th Cir.1984) ("Because the pension plan states that it is to be construed to meet the requirements of ERISA, [the participating and vesting rules require the inclusion of a person in plaintiff's position in the plan,] and there are obvious and significant benefits to meeting those requirements, we conclude that we must construe the plan as including plaintiff as a participant."); see also Abraham v. Exxon Corp., 85 F.3d 1126, 1131 (5th Cir.1996) (finding that court could not look to Treasury regulations to determine employee eligibility for participation in an ERISA plan when it did not contain an explicit provision "declaring that it was to be construed to meet the requirements of an ERISA plan")
 
 
 [13]
 The pertinent Treasury Department regulation provides that
 [i]f the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor, or the like.
 Treas. Reg. § 31.3401(c)-1(e) (emphasis added). Accordingly, that the instruments describe the plaintiffs as independent contractors and provide that as such they are not entitled to benefits is not controlling.
 
 
 [14]
 For this reason, Microsoft's reliance on Grimes v. Allied Stores Corporation, 53 Wash.App. 554, 768 P.2d 528, 529 (1989), in which the court considered a conflict between an employment contract and an employment manual, is inapposite
 
 
 [15]
 Washington case law regarding pension plans, for example, holds that "[a]n enforceable contract will arise ... even though the [employee] does not know the precise terms of the pension agreement." Dorward v. ILWU-PMA Pension Plan, 75 Wash.2d 478, 452 P.2d 258, 260 (1969)
 
 
 [16]
 See Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257, 1268 n. 10 (1985) ("The implication of the presumption of reliance is that the ... provisions became binding the moment the [plan] was distributed. Anyone employed before or after became one of the beneficiaries of those provisions. And if [Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (1980) ] is followed, employees neither had to read it, know of its existence, or rely on it to benefit from its provisions...."); see also A. Corbin, Contracts § 59 (1963) (suggesting that knowledge of an offer is not necessary to establish acceptance)
 
 
 [17]
 Microsoft contends that despite promulgation of a plan, no rights are created unless a promise is made directly to the affected employees. The two cases cited by Microsoft in support of this proposition, Estate of Bogley v. United States, 206 Ct.Cl. 695, 514 F.2d 1027 (1975), and Schmidt v. Avco, 15 Ohio App.3d 81, 472 N.E.2d 721, aff'd, 15 Ohio St.3d 310, 473 N.E.2d 822 (1984), are readily distinguishable. In Bogley, a corporate board of directors voted to offer the plaintiff a severance plan but never actually offered it to him. In Schmidt, there was no allegation that the severance pay policy was published or generally distributed to Avco employees. We also reject Microsoft's argument that the plaintiffs represent a separate class. The plaintiff class is a subset of the class of common-law employees as to whom Microsoft failed to honor its promise of benefits. That the plaintiffs were wronged in this manner hardly makes them a separate class for purposes of determining the scope of the promise
 
 
 [1]
 General Accounting Office, Pub. No. GAO/T-GGD-96-130, Tax Administration: Issues in Classifying Workers as Employees or Independent Contractors 5 (1996) (statement of Natwar M. Gandhi, Associate Director, Tax Policy and Administration Issues, General Government Division)
 
 
 [2]
 Because independent contractors have been found by the IRS to have a lower compliance rate than employees in paying their taxes-to the tune of two to three billion dollars a year-the IRS adopted an aggressive enforcement program in 1986 resulting to date in 12,983 Employment Tax Examination Program audits and the reclassification of 527,000 workers. Id
 
 
 [3]
 See also Associated Builders & Contractors, Golden Gate Chapter v. Baca, 769 F.Supp. 1537 (N.D.Cal.1991) (holding that municipal legislation requiring contractors to pay minimum wages and benefits in order to receive private building permits unconstitutionally impaired the contractors' collective bargaining contracts)