**R. Michael McCOY, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY and Employees Welfare Benefit Plan of Battelle Memorial Institute, Defendants.**

No. CS–97–0161–JLQ.

United States District Court, E.D. Washington.

June 10, 1998.

1136

Patrick Craig Walker, Cowan Walker Jonson Moore, Nickola & Heye, Richland, WA, for Plaintiff.

Medora A Marisseau, Thomas Raymond Merrick, Bullivant Houser Bailey, Pendergrass & Hoffman, Seattle, WA, Rebecca Dean, Bogle & Gates, Seattle, WA, for Defendants.

ORDER GRANTING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

QUACKENBUSH, Senior District Judge.

**BEFORE THE COURT** are Defendants' Motion for Summary Judgment (Ct.Rec.24) and Plaintiff's Cross–Motion for Summary Judgment (Ct.Rec.31), heard with oral argument on January 12, 1998. Plaintiff was represented by Craig Walker; Defendants were represented by Medora Marisseau. Having reviewed the record, heard from counsel and being fully advised, this order is intended to memorialize and supplement the court's oral ruling in the hearing on this matter **GRANTING** Plaintiff's Cross–Motion for Summary Judgment and **DENYING** Defendants' Motion for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The following undisputed facts pertain to the structure of Battelle Memorial Institute, its Travel Accident Plan and the administration of that plan. These facts, while not in the administrative record, are common knowledge and were presumably known by the administrator of that plan. They are included here for background information.

Battelle Pacific Northwest Laboratories ("PNL") and Battelle Columbus are both divisions of Battelle Memorial Institute and thus are not separate legal entities. PNL is located in Richland, Washington. Battelle Columbus is located in Columbus, Ohio.

The ERISA plan at issue here, known as the Business Travel Accident Plan for Employees of Battelle Memorial Institute ("Plan"), covers employees of both PNL and Battelle Columbus. The Plan was issued through Alexander & Alexander Benefits Services Inc. ("A & A"), an insurance broker. The insurer of the Plan is Federal Insurance Company ("Federal"), one of many insurance companies owned and administered by Chubb Group of Insurance Companies ("Chubb").

While the Plan itself does not name or refer to a Plan Administrator, the Summary Plan Description applicable to the Plan ("SPD")[1] names Roger Ballard as the Plan Administrator. Ballard is the Assistant Treasurer of the Benefits Finance Department of Battelle Memorial Institute. Ballard, however, delegated his Plan responsibilities concerning claim determinations to Federal. Accordingly, it is Federal, the insurer liable for paying benefits due under the Plan, that makes the determination of whether benefits are in fact due.

Ballard also delegated his Plan responsibilities concerning the Plan's administrative duties. Those administrative responsibilities were delegated to Ted Simmons, a benefits finance manager for Battelle Memorial Institute. Simmons' administrative duties relating to the Plan include governmental reporting, negotiation of coverage, and preparation of Plan materials. They do not include duties relating to Plan interpretations or claim determinations.

Simmons was also requested by Ballard to act as a liaison between the parties in this action. Ballard made this request in his role as Assistant Treasurer of Battelle's finance department. Accordingly, with regard to the McCoy claim, Simmons acted in his role as a benefits finance manager of Battelle Memorial Institute, rather than in his role as a Plan representative.

The following undisputed facts relate to Mr. McCoy's claim for benefits under the

1. The SPD is not within the administrative record. Indeed, it was only after insistent questioning by the court at the hearing on this matter, as to the location of the relevant SPD, that Defendants finally conceded that the SPD applicable to the instant Plan is the one submitted by Plaintiff in Exhibit C of Court Record 43 at 5–15. Defendants in their briefing to the court had previously asserted that the SPD submitted by Plaintiff was not the one applicable to the Plan at issue here. (Defs.' Supplemental Statement of Facts, Ct.Rec. 47 at 2.) Indeed, on its face, that SPD seems inapplicable since it indicates that Hartford Accident and Indemnity Company is the insurer for Battelle's Travel Accident Plan. (See Supplemental Decl. Walker, Ex. C, Ct.Rec. 43 at 14.) However, as Defendants represented to the Court, the Summary Annual Report dated Sept. 29, 1995, updated that SPD by expressly replacing Hartford with Federal Insurance Company as the provider of the Travel Accident Insurance. While the Summary Annual Report is also not in the administrative record, it too is in the record of this case. (See Decl. of Simmons, Ct.Rec. 51, Ex. A.)

At the hearing on this matter, Defendants also argued that Marlene would not have been provided a copy of this SPD, since in 1995 she was hired as a temporary hourly worker and the SPD is not distributed to hourly workers. Since it is undisputed that hourly workers are covered by the Plan, Defendants are apparently arguing that, in order to for the SPD to be binding, Marlene must have relied on it. However, Defendants cite no authority for that argument and the court questions its validity for the reasons set forth in *Lancaster v. United States Shoe Corp.*, 934 F.Supp. 1137, 1155–56 (N.D.Ca.1996) (concluding, after thorough analysis, that the Ninth Circuit would not require reliance on an SPD in order for the SPD to govern over a conflicting ERISA plan). Furthermore, the SPD here does not conflict with the Plan. The sole import of the court's references to the SPD is to demonstrate that the court's interpretation of the Plan's terms and provisions is consistent with and supported by the language of the SPD.

Plan and are contained within the administrative record ("Admin.Rec.").[2] Marlene McCoy was hired as a full-time salaried employee at PNL in April, 1994. (Admin. Rec. at 299–300.) She resigned that position in September of 1994, to spend time with her children. (Admin. Rec. at 264.) In August of 1995, Marlene sought re-employment with PNL and on September 6, 1995 was re-hired by PNL as a temporary hourly employee. (Admin. Rec. at 256, 259.)

In December 1995, Battelle posted a job opening for its Columbus, Ohio offices. Marlene applied and interviewed for the position. An internal private Battelle document entitled "Job Offer Summary" indicates that on December 7, 1995, Battelle Columbus made a verbal offer of employment to Marlene, which she accepted. (Admin. Rec. at 231.) That document indicates that Marlene was to start at Battelle Columbus after a clean drug test and after she drove across the country. (Admin. Rec. at 231.) That document refers to Marlene's move from PNL to Battelle Columbus as a "transfer" in three separate places. (Admin. Rec. at 231.) In the lower left corner of the document entitled "Job Offer Summary" there is an attachment dated December 13, 1995. That attachment suggests that Marlene completed the drug screening on December 11, her physical was scheduled for December 15, and her start date at Battelle Columbus was to be "1/8/95" [sic].[3] (Admin. Rec. at 231.)

In a letter dated December 11, 1995, Battelle Columbus, apparently memorializing its oral offer, extended to Marlene a written offer for that same full-time position at the Columbus facility referred to in the "Job Offer Summary." (Admin. Rec. at 232.) In that letter, Battelle Columbus indicated that the offer was contingent on successful completion of a physical exam, including drug screening. Id. It also indicated that while Marlene's start date would be determined

once Battelle Columbus received approval of the physical exam and drug screening, Battelle Columbus would have to actually receive the physical and drug screening results before Marlene could begin work. Id. The offer letter indicated that Battelle Columbus would pay the reasonable and actual costs of lodging, meals and mileage of relocating to Columbus Ohio. Id. The offer letter requested Marlene to accept the offer by countersigning the letter, which Marlene did on December 15, 1995, and returning the original of the letter. Id. A notation and date stamp on the letter indicates that the letter was postmarked December 23, 1995 and received by Battelle Columbus on January 3, 1996. Id.

On December 19, 1995, an internal e-mail was sent to a PNL employee informing her that "[Marlene McCoy] is transferring to Battelle Columbus" and requesting the employee to "make up [Marlene's] exit packet" and drop it off at the manager's office. (Admin. Rec. at 287.) Marlene completed that exiting process on December 22, 1995. (Admin. Rec. at 287.) Pursuant to that process, a PNL form entitled "Termination/Leave of Absence Clearance" was completed. (Admin. Rec. at 239.) That form indicated that Marlene had returned all items belonging to PNL (keys, identification badge, security passes, corporate credit cards), and that all of Marlene's outstanding accounts had been closed. (Admin. Rec. at 239.) Simmons informed the Plan Administrator that this formal sign-out process is required of all exiting employees, both terminating and transferring, for security reasons and is a government requirement imposed on all national laboratories performing government contract activities. (Admin. Rec. at 94.)

Nothing in the Battelle documents in the administrative record otherwise suggests that Marlene's completion of this exiting process on December 22, 1995 resulted in her being terminated as a Battelle Memorial em-

---

**2.** A true and complete copy of the administrative record as submitted by Darla Lane, the regional casualty claims supervisor for Chubb & Son, Inc., which in turn is the claims manager for Federal, is contained in Court Record 26. See Decl. Lane, Ct.Rec. 26, Ex. A, 1–325.

**3.** The information suggested by the attachment to the document entitled "Job Offer Summary" is

confirmed in a letter written by Simmons and addressed to Darla Lane, dated June 3, 1997. See Supplemental Decl. Walker, Ct.Rec. 43, Ex. C at 76. However, the court has been unable to find a copy of Simmons' letter in the true and complete copy of the administrative record, as submitted by Lane to this court on September 23, 1997. See generally, Decl. Lane, Ct.Rec. 26, Ex. A.

ployee or that it affected her official status as a Battelle employee in any way. PNL maintains "STRICTLY PRIVATE" employee records entitled "STAFF MEMBER STATUS CHANGE FORM," which list and date personnel actions taken with respect to each employee, such as the date hired, the date rehired, the date terminated, the. date resigned, the date of a new position, etc. (*See, e.g.,* Admin. Rec. at 240, 291.) Marlene's "STAFF MEMBER STATUS CHANGE FORM" does not indicate that Marlene's employment status was terminated as a result of the December 22, 1995 exiting process. (Admin. Rec. at 240, 291.) Rather, Marlene's "STAFF MEMBER STATUS CHANGE FORM" indicates that the only change made to Marlene's official employment status since her 1995 re-hire was her termination, effective December 30, 1995, with the reason listed for that action being "Death." (Admin. Rec. at 291.) Prior to that action being taken, there had been a notation in the comment section of Marlene's "STAFF MEMBER STATUS CHANGE FORM" which provided that Marlene's "Component Transfer" was to be effective January 1, 1996. (Admin. Rec. at 240.)

Simmons, the Battelle employee acting as a liaison between the parties in this matter and the individual delegated with the administrative responsibilities of the Plan, communicated to the Plan Administrator that Battelle's position is that Marlene "never terminated from Battelle" but rather she "continued to be a Battelle employee" after the exiting process. (Admin. Rec. at 94.) Recognizing that the exiting process completed by Marlene "may appear to an outsider to be a termination," Simmons carefully explained to Federal that:

> this process is a formal requirement stipulated by all national laboratories performing government contract activities. It is required for security purposes as well as to maintain certain medical information for control group participants. Further, all government access must be canceled and any government equipment must be returned. Our position is that McCoy continued to be a Battelle employee. She never terminated from Battelle and in fact was in the process of transferring to. Columbus for another assignment. The Co-

lumbus paperwork clearly reflects that this was intended to be a transfer as contrasted to a termination and a subsequent rehire. (Admin. Rec. at 94).

Simmons has repeatedly communicated Battelle's position to Federal; he has also provided Federal with Battelle documents supporting this position. (*See* Admin. Rec. at 222–223, 94.) ·Nothing in any·of the Battelle documents in the administrative record contradicts Simmons' conclusion that Marlene was still a Battelle employee after completion of the exiting process. Rather, that conclusion is supported by at least three Battelle documents in the administrative record, all of which refer to Marlene's move from PNL to Battelle Columbus as either a lateral or component transfer, (*see* Admin. Rec. at 238, 239, 240), which was to be effective January 1, 1996 (Admin. Rec. at 240).

On December 29, 1995, while driving in her personal car and accompanied by one of her children, Marlene was killed in an automobile accident in Wendell, Idaho. (Admin. Rec. at 225, 228.) Marlene was en route to Columbus, Ohio, where she was scheduled to begin work at Battelle Columbus in ten days. (*See* Admin. Rec. at 225, 228.)

The last day that Marlene worked at PNL ·was December 22, 1995. She earned no wages from PNL after that date and neither Marlene, nor her estate, has ever been paid relocation expenses. Marlene's final paycheck, dated and issued on December 29, 1995, was for work through December 22, 1995. (Admin. Rec. at 237.)

After Marlene's death, her husband was advised by Battelle that Marlene was eligible for benefits under the Plan. Battelle obtained the forms· necessary for Mr. McCoy, the surviving spouse and executor of Marlene's estate, to claim the benefits. Battelle prepared and submitted those forms for Mr. McCoy, on his behalf. (*See* Admin. Rec. at 222–24.)

By letters dated October 18, 1996 and November 12, 1996, Federal notified Mr. McCoy that it was·denying his claim for benefits based on its conclusion that (1) Marlene was not an "Insured" under the policy because she, was not on the payroll at the time of her death and (2) she was not traveling on the business of Battelle at the time of her death, because such travel does not include "com-

mutation." (Admin. Rec. at 142–144, 136–137.) Based on the foregoing, Federal concluded that the circumstances of Marlene's death were "specifically excluded" from the accident policy. (Admin. Rec. at 144, 136.) The declination letters did not assert that Marlene was not an employee of Battelle's. Rather, the declination letter dated November 12, 1996, referred to Marlene's move to Battelle Columbus as a "transfer." (Admin. Rec. at 144.) Both declination letters invited Mr. McCoy to submit additional information which might affect the company's coverage analysis. (Admin. Rec. at 142–144, 136–137.)

In a Complaint dated March 27, 1997, Mr. McCoy filed suit in the Superior Court of Benton County seeking a Declaratory Judgment that Marlene's estate was entitled to the Plan's policy amount of $300,000. On April 22, 1997, Defendants removed the suit to this court pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. On September 29, 1997, Defendants filed their Motion for Summary Judgment (Ct.Rec.24) and on October 15, 1997, Plaintiff filed his Cross–Motion for Summary Judgment (Ct.Rec.31). Both Motions were heard by the court on January 12, 1998.

### DISCUSSION

#### Issue I—Standard of Review

■ A determination that denies benefits under an ERISA plan is reviewed de novo unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When the plan confers discretion, that discretion is reviewed under the abuse of discretion standard. *See Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1321 (9th Cir.1995).

■ While no magic words are needed to confer discretion, language that establishes only an entity's right to administer or manage the plan is insufficient. *Bogue v. Ampex Corp.* 976 F.2d 1319, 1325 (9th Cir. 1992). The *Bogue* court emphasized the policy considerations behind requiring language that unambiguously confers discretion in the administrator or fiduciary:

We do not want to encourage an employer to insulate himself from effective appellate review through the abuse of vague phrases that fail to make clear to the employees that the employer will have the final determination of benefit decisions. Employees who lose promised benefits should not lose the additional benefit of judicial review because their employer reserved discretionary power to itself without making that reservation clear.

*Id.* at 1325. Thus, a plan gives the fiduciary authority to determine eligibility if the plan includes at least "one important discretionary element, **and the power to apply that element is unambiguously retained by its administrator.**" *Kearney v. Standard Insurance Co.*, 144 F.3d 597, 605 (9th Cir.1998) (quoting *Bogue*, 976 F.2d at 1325) (emphasis in *Kearney*).

■ Here, Defendants assert that the proper standard for this court to review Federal's declination decision is abuse of discretion because Battelle's Travel Accident Plan unambiguously confers discretion on the administrator to make such decisions. The only language in the Plan, however, cited by the Defendants in support of their position is found in Section VII of the Plan under the subheading "Time of Payment of Claims" and provides: "Benefits payable under this policy for any loss will be paid immediately upon receipt of **due** proof of loss." (*See* Admin. Rec., Ex. B.) Thus, the issue before this court is whether the word "due" in the above quoted language unambiguously confers discretion in the administrator of the Plan in such a manner as to make it sufficiently clear to employees that it is the plan administrator who "will have the final determination of benefit decisions." *See Bogue*, 976 F.2d at 1325.

#### *Battelle's Travel Accident Plan Does Not Unambiguously Give Discretionary Authority to the Plan Administrator Because the Plan Does Not Contain a Discretionary Element Nor Does the Plan Grant the Administrator the Authority to Apply the Purported Discretionary Element.*

First, the Plan here does not contain a discretionary element. The use of the word

"due" in the phrase "due proof of loss" does not even suggest discretion. *See American Nat. Ins. Co. v. Yee Lim Shee,* 104 F.2d 688, 693 (9th Cir.1939). To the contrary, the Ninth Circuit has held that the language "due proof" in an insurance policy requires only such proof as would enable the insurance company to consider its rights and liabilities; it does not require proof sufficient "to satisfy the insurer of the existence of the [loss] under the terms of the policy." *Yee Lim Shee,* 104 F.2d at 693; *see also* Annotation, *Life Insurance—Proof of Disability,* 109 A.L.R. 825. Thus, the language in Battelle's Plan requiring "due proof of loss" before payment of benefits does not constitute a discretionary element.

Second, even were "due proof" held to constitute a discretionary element, that discretion is not unambiguously retained by the Plan's Administrator. The Ninth Circuit recently interpreted ERISA plan language nearly identical to that in the instant plan and firmly rejected any notion that "so imprecise and ambiguous a provision" could be construed as vesting discretion in an ERISA plan administrator. *See Kearney v. Standard Ins. Co.,* 144 F.3d 597, 605 (9th Cir. 1998). In *Kearney,* the ERISA plan before the court provided that the insurance company would pay disability benefits "upon receipt of **satisfactory written proof** that [the claimant has] become [disabled]." *Id.* at 604 (emphasis added). The Ninth Circuit held that the appropriate standard of review in that case of the administrator's declination decision was de novo because the plan did not retain the "power to apply" the discretionary element of satisfactory proof in the plan administrator.

In doing so, the Ninth Circuit distinguished the plan language in *Kearney* from that in a prior decision, *Snow v. Standard Ins. Co.,* 87 F.3d 327 (9th Cir.1996), a case heavily relied on by Defendants here. The ERISA plan in *Snow* provided that there would be no benefit paid "unless [the company] is presented with **what it considers to be** satisfactory proof of the claimed loss." *Id.* at 330 (emphasis added). Unlike the language in *Snow,* however, the language in the ERISA plan in *Kearney* did not include similar language granting the plan administrator the discretion to apply its subjective judgment as to whether the proffered proof was satisfactory. Accordingly, the *Kearney* court held that the absence of an explicit delegation of discretionary authority to the ERISA plan's administrator required that an objective standard be applied when determining what constitutes satisfactory proof of loss and further, required those determinations to be reviewed de novo. *Id.* at 610.

Here, like in *Kearney,* there is absolutely no language in Battelle's Travel Accident Plan retaining in the Plan Administrator the power to apply any discretionary element. In fact, the Plan here does not even indicate that there is a Plan Administrator. Accordingly, as in *Kearney,* the failure of the drafters of the Plan at issue here to unambiguously provide that it is the Plan Administrator who has the discretion to make eligibility determinations and/or interpret terms, requires the court to review the Plan Administrator's declination decision de novo.

**Issue II—Scope of Review**

■ If the court determines that the abuse of discretion standard applies, then the scope of the court's review is limited to the administrative record. *Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480 (9th Cir.1990). However, when conducting de novo review the court may in its discretion consider additional evidence in limited circumstances. *Mongeluzo v. Baxter Travenol Long Term Disability Ben., Plan,* 46 F.3d 938, 943–44 (9th Cir.1995). That discretion should be exercised, however, only when such evidence is needed to conduct an adequate de novo review. *Id.*

■ In the instant case, other than the background information relating to Battelle Memorial Institute and the Plan's administration, evidence outside the administrative record is unnecessary since the material facts are undisputed. Accordingly, the court shall limit its de novo review of the Plan Administrator's declination decision to the administrative record.

**Issue III—Whether Marlene's Estate is Entitled to Benefits under the Plan.**

The ERISA plan at issue here, Battelle Memorial's Business Travel Accident Plan,

provides certain "insured" individuals with benefits if they suffer a covered hazard, including death, while traveling "on the business of" Battelle Memorial. The Plan Administrator declined Mr. McCoy's claim for insurance benefits on the basis that Marlene was not an "insured" individual under the plan at the time of her death and because she was not "on the business" of Battelle Memorial at the time of her death.

The Plan Administrator's declination decision was first communicated to Mr. McCoy in a letter dated October 18, 1996 and signed by Julie Bridge ("Bridge"), a claim examiner for Chubb Insurance. (Admin. Rec. at 142–44.) In that letter, Bridge simply referred Mr. McCoy to Section III of the Plan[4] and then concluded that Marlene's death while traveling to Ohio was specifically excluded from coverage under the Plan. (Admin. Rec. at 142–44.)

An additional letter from Bridge, dated November 12, 1996, was sent to Mr. McCoy at his request for clarification of Federal's declination position with regard to the claim. (Admin. Rec. at 136–37.) The second letter indicated that coverage was declined because at the time of her death Marlene was not on the payroll or receiving benefits and was not "on the business of the policy holder," which the letter stated is defined in the Plan as "furthering the business interest of the policyholder" and does not include commutation travel, vacation or leave of absence. Accordingly, Bridge again concluded that since Marlene was traveling to her new residence and was not on the business of Battelle, nor on its payroll, the circumstances surrounding her fatality are "specifically excluded" from coverage under the Plan. (Admin. Rec. at 136–37.)

Bridge also sent an additional letter, dated December 18, 1996, to Tim Simmons in response to a letter from Simmons disagreeing with the declination of coverage as set forth in the declination letter to Mr. McCoy dated November 12, 1996. (Admin. Rec. at 38.) In that letter, Bridge's explanation of Federal's declination decision differs somewhat from that provided to Mr. McCoy. However, since Mr. McCoy was never provided with a copy of that letter, see Decl. McCoy, Ct.Rec. 36, at 3, ¶ 10, the reasons stated for the declination decision in the letter to Simmons cannot be construed as the basis for Federal's denial of **Mr. McCoy's** claim. *See* 29 C.F.R. § 2560.503–1(f) (providing, *inter alia,* that every **claimant** shall be provided with written notice of the specific reasons for the Plan's denial of benefits) (emphasis added).

In conducting its de novo review of the Plan Administrator's declination decision, this court interprets the Battelle Travel Accident Plan by looking to its terms and any other manifestations of intent. *See Nelson v. EG & G Energy Measurements Group,* 37 F.3d 1384, 1389 (9th Cir.1994). Terms of an ERISA plan are interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990). An ERISA provision is ambiguous if it is subject to reasonable alternative interpretations. *Babikian v. Paul Revere Life Ins.,* 63 F.3d 837, 840 (9th Cir.1995). Generally, if an ambiguity persists in a contract after reference to

---

4. Section III of the Plan provides as follows:

*Section III—Hazards Insured Against*

Subject to the terms of the policy, and provided such hazards arise out of and occur while "on the business of the policyholder" as defined below, the hazards insured against are all those to which the Insured may be exposed while:

Traveling to a point or points located away from the premises of the policy holder in the city of the Insured's permanent assignment, including sojourn.

The following qualifies the above:

1. coverage begins at the actual state[sic] of an anticipated trip whether it be from the Insured's regular place of employment, residence, or other locations. Coverage ends immediately upon return to the Insured's regular place of employment or residence, whichever occurs first.

"On the business of the policy holder" means: while on assignment by or at the direction of the policyholder for furthering the business interest of the policyholder.

It does not include:

a) "Commutation travel"; or

b) any period of vacation or leave of absence of the Insured

"Commutation Travel" means: the regular or frequent travel between residence and place of employment usual to the Insured.

*See* Decl. Lane, Ct.Rec. 26, Ex. B.

extrinsic evidence, the rule of *contra proferentem* is applied and the ambiguous terms are construed against the drafter. *Id.* With respect to insurance contracts, the rule of *contra proferentem* is strictly applied. *Eley v. Boeing Co.*, 945 F.2d 276, 280 (9th Cir. 1991). Applying the foregoing principles, the court finds that the Plan Administrator's declination decision was in error.

### Marlene's Estate Is Entitled to Plan Benefits Because at the Time of Her Death Marlene Was an "Insured" Who Was Travelling "On the Business" of Battelle Memorial Institute.

**A. At the time of her death Marlene was an "Insured," as defined by the Plan, because she was a Battelle Memorial Institute employee paid through U.S. payroll.**

With some exclusions not relevant to the case at bar, the Plan defines "Insureds" to include "[a]ll employees who are paid by U.S., Canadian, and British payrolls." (*See* Admin. Rec., Ex. B.) In its declination letter to Mr. McCoy, the claims examiner declined benefits on the basis that Marlene was not an "insured" because she was not on Battelle's payroll at the time of her death. On judicial review here, Defendants reassert this argument. In addition, Defendants assert for the first time that Marlene was also was not an "Insured" because she was not a Battelle employee at the time of her death.

**1. *The Plan waived the argument that Marlene was not an employee and, even had it not, the administrative record establishes that Marlene was an employee of Battelle Memorial at the time of her death.***

On judicial review of the Plan's declination decision, Defendants argue for the first time that Marlene was not an employee of Battelle Memorial at the time of her death. As a preliminary matter the court must decide whether an ERISA plan may assert on judicial review a reason for denial that was not contained in the plan administrator's declination decision and yet which was necessarily considered by the plan administrator.

An ERISA plan is required to:

provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f). This regulation serves to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure that further review of that denial, both administrative and judicial, is meaningful. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir.1992). Further, the Ninth Circuit has made it clear how this regulation is to be construed:

In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

*Booton v. Lockheed Medical Ben. Plan,* 110 F.3d 1461, 1463 (9th Cir.1997).

Nonetheless, despite the ERISA regulation cited *supra,* the Ninth Circuit has allowed a Plan to assert a new basis for denial of ERISA benefits for the first time on judicial review. *See Vizcaino v. Microsoft Corp.,* 120 F.3d 1006 (9th Cir.1997) ("*Vizcaino II* ") *reh'g Vizcaino v. Microsoft Corp.,* 97 F.3d 1187 (9th Cir.1996) ("*Vizcaino I* "). In *Vizcaino,* the plan administrator's reasons for denying ERISA benefits were erroneous and thus not pursued by the prevailing employer on review before the district court.

*Vizcaino II*, 120 F.3d at 1013. Instead, the employer asserted to the district court an entirely new basis for denying benefits, upon which the plan administrator had not opined. *Id.* The employees initially objected to the district court's consideration of the Plan's new argument because it did not appear in the administrative record. *Vizcaino I*, 97 F.3d at 1193. However, the employees waived their objection and urged the district court, and later the appellate court, to address the new argument. *See Vizcaino II*, 120 F.3d at 1013. The district court did so and, on the basis of that new argument, held in favor of the employer, thereby precluding the employees from receiving the plan benefits. *Id.*

On appellate review, a three-judge panel of the Ninth Circuit also allowed the new basis for declining benefits to be argued, although rejecting the argument on its merits. *Vizcaino I*, 97 F.3d 1187. The Ninth Circuit reheard the panel decision *en banc*. *Vizcaino II*, 120 F.3d 1006. Of relevance here, is that the Ninth Circuit, in its *en banc*, rehearing also considered the new argument and, in fact, remanded the case to the plan administrator in order to allow the administrator to be the one to consider the employer's new argument in the first instance. *Id.* at 1013.

Unfortunately, however, the reason the *Vizcaino II* court allowed a new argument to be made for the first time on judicial review is difficult to ascertain from the split of opinions in that case, and thus the decision provides little guidance here. The court's main opinion, signed onto by only three judges, does not speak to the issue. Further, the three-judge opinion which concurred only with the remand, disagreed with the main opinion's analysis of the issue. *See Id.* at 1018–20 (O'Scannlain, J., concurring in part and dissenting in part). Thus, the argument voiced by the opinion of the five remaining judges, who specifically dissented to the remand, that a Plan waives a basis for declining ERISA plan benefits if it does not assert

that basis to the administrator, was not addressed by a majority of the court. *See Vizcaino II*, 120 F.3d at 1015–16 (Fletcher, J., concurring in part and dissenting in part).

While arguably, under *Vizcaino II*, Defendants are entitled to assert for the first time on judicial review that the Plan Administrator properly denied benefits to Marlene's estate because Marlene was not an employee of Battelle Memorial at the time of her death, that conclusion is not inevitable given that court's failure to identify its rationale for allowing the employer to assert its new argument for the first time before the district court. While it is of course possible that the *Vizcaino II* decision stands for the general proposition that an ERISA Plan Administrator does not waive a basis for denying benefits by not raising it during the administrative process, this court finds it unlikely that the *Vizcaino II* court intended its decision to be read so broadly, especially in light of the policy concerns self-evident in the detailed mandates contained in the ERISA regulations. *See Vizcaino II*, 120 F.3d at 1016 (Fletcher, J., dissenting). Indeed, such a broad interpretation of *Vizcaino II* will inevitably result in multiple appeals of ERISA decisions, precluding finality and economy in ERISA litigation.[5]

Moreover, there are alternate and equally plausible readings of the *Vizcaino II* decision which do promote finality and judicial economy in ERISA claims and do not render ERISA regulations such as 29 C.F.R. § 2560.503–1(f) meaningless. Both are supported by such Ninth Circuit opinions as *Friends of the Coast Fork v. United States Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir.1997), wherein the Ninth Circuit held that administrative agencies are bound by the reasons stated in their FOIA denial letter and thus are precluded from conjuring up new reasons for their denial on judicial review.

5. This is aptly demonstrated by this case. Here, Defendants support their assertion that Marlene was not an employee by reasoning that Battelle Columbus' employment offer was contingent on Battelle's receipt of Marlene's physical and drug screen and "[t]here is no evidence Battelle received the results of ... [the] physical exam."

*See* Defs.' Mem. in Support of Defs.' Mot. for Summ. J., Ct. Rec. 25 at 9. Defendants' argument overlooks the fact that since Marlene's status as an employee was not disputed below, there was no reason for Plaintiff to establish Battelle Columbus' receipt of those results.

The first is that the *Vizcaino II* court allowed the employer to set forth a new basis for declination because the employees waived their objection to the court considering it. A second plausible reading of *Vizcaino II*, and one which is suggested by the concurring opinion written by Judge O'Scannlain, is that the court's decision to remand the case to the plan administrator was controlled by the very unusual facts in that case. The plan administrator of the ERISA plan in *Vizcaino II* never had to interpret the ERISA plan because the administrator found that a contract separate and distinct from the ERISA plan controlled the outcome of the dispute of whether the employees were entitled to ERISA benefits. Therefore, as pointed out by Judge O'Scannlain, the plan administrator never had the opportunity to exercise the discretion specifically and unambiguously granted to it in the ERISA plan to construe the plan's terms. Thus the concurrence concluded, remand was appropriate since it was not the province of the court to impose its view of a provision of an ERISA plan when the plan vests the administrator with that discretion but rather, the court is confined to reviewing the administrator's interpretations of those provisions to ensure that they are reasonable. *Id.* at 1022 (O'Scannlain, J., concurring in part and dissenting in part).

Since either of the latter two interpretations of *Vizcaino II* is consistent with ERISA policy and its implementing regulations, and promotes finality and economy in ERISA litigation, this court concludes that *Vizcaino II*'s holding does not preclude finding that a basis for declining ERISA plan benefits is waived by the plan's failure to assert that basis at the administrative level when squarely faced with the issue. Here, unlike in *Vizcaino*, the Plan already had the opportunity to rely on this argument and it failed to do so. Further, unlike in *Vizcaino*, Plaintiff here has neither encouraged nor acquiesced to the court's consideration of this new argument. Finally, unlike in *Vizcaino*, there is no grant of discretionary authority in the Plan here, to which this court should defer. Accordingly, the court concludes that Defendants waived as a basis for the declination decision their current argument that Marlene was not a Battelle Memorial employee at the time of her death by failing to assert it previously when they had the opportunity to do so.

 Finally, even had the Plan not waived the argument it now advances, the administrative record clearly establishes that Marlene was a Battelle Memorial Institute employee at the time of here death. Indeed, after detailed scrutiny of the administrative record, the Plan Administrator's failure to base its declination decision, in whole or part, on the basis that Marlene was not a Battelle Memorial employee at the time of her death is certainly understandable because such a conclusion is inconsistent with the administrative record and irreconcilable with Endorsement # 5 of the Plan, which extends insurance coverage to spouses and minor children traveling with relocating employees. Accordingly, *assuming arguendo* that the court's interpretation of *Vizcaino II* is incorrect and that the Plan is entitled to assert a basis for declining Plan benefits to Marlene's estate for the first time on judicial review, the court nonetheless rejects Defendants' argument for the following reasons.

For the court to conclude that Marlene was not a Battelle Memorial employee at the time of her death, the administrative record would have to establish that Marlene's employment relationship with Battelle Memorial terminated at the time Marlene completed the exiting process. However, other than the occurrence of the exiting process itself, nothing in the administrative record supports that conclusion. There is simply no evidence that the completion of that process terminated Marlene's employment relationship with Battelle Memorial; nothing in any of the PNL documents in the administrative record suggests that the exiting process terminated or altered Marlene's official employee status, that the company or its officials considered Marlene's completion of that process to have terminated her employment relationship with Battelle Memorial, or that any change to her employment status was contemplated prior to the effective date of her transfer to Battelle Columbus. To the contrary, Simmons has indicated on behalf of Battelle, that the exiting process did not terminate Marlene's official employment status, that she continued to be an employee after its completion,

and that the process in question was simply a government security requirement imposed on all transferring and terminating employees of national laboratories performing under government contract.

Further, Defendants' argument completely ignores the overwhelming evidence that both PNL and Battelle Columbus considered Marlene's relocation to be a lateral transfer from one division of Battelle Memorial to another, as opposed to a termination and subsequent rehire. *See, e.g.,* Admin.Rec. at 94 (letter from Simmons to A & A noting that Marlene "was in the process of transferring to Columbus for another assignment" and that "[t]he Columbus paperwork clearly reflects that this was intended to a transfer contrasted to a termination and subsequent rehire"). Indeed, the documents administrative record consistently refer to Marlene's relocation as a lateral or component transfer from PNL to Battelle Columbus, which was not to be effective until January 1, 1996. Transfer is defined as "mov[ing] or send[ing] to a different location esp. for business, vocational or military purposes." Webster's Third New Int'l Dictionary 2427 (unabridged edition 1961). Thus a transfer, by definition, implies an ongoing, continuous, and active relationship and nothing before the Plan Administrator controverts that common understanding.

Accordingly, the court concludes that the administrative record clearly indicates the exiting process completed by Marlene was merely a procedural requirement necessary for her to effect a lateral or component transfer ·to a different division of Battelle Memorial and thus did not terminate her employment status ·with Battelle Memorial.

Accordingly, since the administrative record establishes that at the time of her death, Marlene's employment relationship with Battelle Memorial was an ongoing one, Defendants' contention that Marlene was not an employee at the time of her death is rejected.

■ Furthermore, even had the exiting process terminated Marlene's employment with the PNL division of Battelle Memorial, a conclusion which the court finds entirely inconsistent with the fact that Marlene's transfer to Battelle Columbus was not to be effective until January 1, 1996, to prevail on their argument that Marlene was not an employee, Defendants would also have to establish that Marlene did not enter into an employment relationship with Battelle Columbus prior to her death. However, the administrative record strongly suggests that a non-contingent verbal offer of employment was extended to Marlene by Battelle Columbus on December 7, 1995, which Marlene accepted. (*See* Admin.Rec. 231.) Alternatively, the record also strongly suggests that the written offer of employment made to Marlene by Battelle Columbus was accepted by Marlene when she countersigned the letter, returned the offer letter to Battelle Columbus, and satisfactorily completed the physical examination with drug testing.[6] (*See* Admin.Rec. 231–32; Supplemental Decl. Walker, Ct.Rec. 43, Ex. C at 76.) Thus, even had the exiting process terminated Marlene's employment status with the PNL division of Battelle Memorial Institute, there is strong, albeit not conclusive, evidence in the administrative record suggesting that there was a

---

**6.** The court rejects Defendants' contention that Battelle Columbus' offer of employment could not be accepted until Marlene actually appeared for work in Columbus and signed some employment papers, and until Battelle actually received a hard copy of the results of Marlene's physical examination. (*See* Defs.' Mem. in Opposition to Pl.'s Mot. for Summ. J., Ct.Rec. 48 at 7.) While the written job offer does state that the offer was contingent on "successful completion of a physical examination, including drug screening," a contingency which was apparently satisfied, *see supra* n. 3, the letter does not establish that the offer itself was also contingent on satisfaction of those other conditions. (*See* Admin.Rec. at 232). To the contrary, the offer invited immediate acceptance by signing and returning the letter,

which obviously could not be accomplished if the offer was contingent on Marlene showing up for work in Ohio. Pursuant to well-established contract law, conditions such as the ones presented here do not prevent a contract from coming into being. Rather, they qualify a duty under a contract; that is, such conditions must occur or be excused before the other party's performance under the contract becomes due. *See generally,* Restatement (Second) of Contracts § 224. Accordingly, failure of any of the conditions (appearing for work, signing employment papers and sending a copy of exam results) does not preclude the existence of an employment contract between Marlene and Battelle Columbus, rather it would preclude Marlene from starting work.

valid employment contract between Marlene and Battelle Columbus at the time of Marlene's death. Accordingly, were it necessary for the court to reach this issue, evidence outside of the administrative record would be needed for the court to conduct an adequate de novo review of Marlene's employment status with Battelle Columbus. *See Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan,* 46 F.3d 938, 943–44 (9th Cir. 1995).

It should. be noted that the court does dispute the reasonableness of Defendants' proposed definition of employee as encompassing those persons subject to another's control or right of control, under an express or implied agreement. *Accord Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (holding that when a federal statute does not provide a definition for "employee," does not give specific guidance on the meaning of the term "employee," and does not otherwise suggest the common-law definition is inappropriate, then the court will presume Congress intended to incorporate the common-law agency definition of "employee" into the statute). Rather, the court disagrees with Defendants' conclusion that application of that definition excludes relocating employees as they are not subject to the employer's control or right of control. (*See* Defs.' Mem. in Opposition to Pl.'s Mot. for Summ. J., Ct.Rec. 48 at 7.)

According to Defendants' interpretation of the word employee, while it is couched in terms of a the common-law definition, it encompasses individuals only during those time periods when that the employer could physically control them. *See* Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J., Ct.Rec. 25 at 10 (arguing that there was no right "to exert any control or direction on the time spent in the journey, when [Marlene] left, who she travelled[sic] with, by what route and what she did on the trip.") This interpretation of employee is irreconcilable with the rest of the Plan's provisions. Specifically, Defendants' conclusion that relocating individuals are not employees because there is no right of the employer to control their actions, cannot be reconciled with Endorsement ·# 5 of the Plan which provides:

**SPOUSE AND DEPENDENT CHIL- DREN COVERAGE**

Coverage is hereby extended to spouses of Insureds and their unmarried dependent children[ ] who are under 23 years of age, while traveling with or in conjunction with the business travel of an Insured as defined in the policy (including relocation trips) provided such trip is authorized by and at the expense of the Policyholder.

(*See* Admin.Rec., Ex. B.) Endorsement # 5 clearly establishes that the drafters of the Plan contemplated that employees relocating at the policyholder's expense and with its authorization were to be covered by the Plan. Defendants' definition of employee renders this provision, for all practical purposes, a nullity. Pursuant to Defendants' definition, Marlene was not an employee because she was relocating and relocating employees are not under the physical control of the employer. However, if a relocating individual is not an employee then the parenthetical in Endorsement # 5 of the Plan, extending coverage for spouses and children traveling with a relocating employee, would be meaningless.

Accordingly, while the rule of *contra proferentem* is available and would result in construing a term which is subject to reasonable alternatives interpretations against the drafter and in favor of the Insured, here reliance on the rule is not necessary because Defendants' proposed definition renders the parenthetical in Endorsement # 5 of the Plan meaningless and thus is unreasonable. · Accordingly, a reasonable interpretation of the term "employee" as used in this Plan, which is also consistent with the common law definition of employee, is one which encompasses individuals relocating between different divisions of the same company, at the company's expense and with ·its authorization. Pursuant, to this definition, Marlene was an employee of Battelle Memorial at the time of her death.

**2. Applying the doctrine of contra proferentem, Marlene was "paid through U.S. payroll."**

Pursuant to the Plan, all Battelle Memorial employees "who are paid by U.S., Canadian, and British payrolls" are insured by the Plan. Defendants do not dispute that on the day of Marlene's death, December 29,

1995, a PNL payroll check was issued to Marlene, for her work through December 22, 1995. (*See* Pl.'s Am. Stmt. of Facts, Ct.Rec. 42 at 9, ¶ 24; *see generally* Defs.' Supplemental Stmt. of Facts, Ct.Rec. 47; LR 56.1(d).) Defendants argue nonetheless that Marlene was not "on Battelle's payroll" [7] at the time of her accident, and thus does not satisfy the Plan's definition of "Insureds," because **at the time of her accident** she was not earning any salary or wage, and any relocation expenses paid to her would have been paid through accounts payable. *See* Defs.' Mem. In Supp. of Defs.' Mot. for Summ. J., Ct.Rec. 25 at 8.[8] In reply, Plaintiff argues that the language "paid by U.S. . . . . payroll[ ]" cannot logically be interpreted so restrictively, but rather, should be interpreted simply as referring to those employees who, when paid, are paid through one of the qualifying payrolls. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., Ct.Rec. 33 at 9.)

Pursuant to the plain meaning of the provision "employees who are paid by U.S., Canadian, and British payrolls," the provision refers to those employees of the policyholder, Battelle Memorial Institute, that are paid through one of the qualifying payrolls. Thus, Plaintiff's proffered interpretation is certainly reasonable since it is consistent with the ordinary meaning of the provision.

In contrast, Defendants' proffered interpretation strains the plain meaning of the provision. Nothing in the language "paid by U.S. . . . . payroll[ ]" suggests that qualifying employees are only "Insureds" during those time periods for which they are actually earning wages or salary. Further, the express language of the Plan provides that coverage ends "[o]n the date the Insured no longer fits within the Description of Persons Insured." A plain reading of that provision suggests that coverage ends on the date an individual ceases to be a Battelle employee or on the date an employee is no longer paid through one of the qualifying payrolls; it

does not suggest that coverage ends daily, when an employee paid by U.S. payroll clocks out at the end of the day, or that it ends weekly, when an employee paid by U.S. payroll leaves for the weekend.

Despite the court's concern with the Defendants' interpretation of the Plan language "paid by U.S. . . . . payroll[ ]," the court will nonetheless presume that both proffered interpretations are reasonable. Accordingly, assuming the reasonableness of Defendants' interpretation, the Plan language "paid by U.S., Canadian, and British payrolls" is ambiguous because it is subject to alternative reasonable constructions.

The court's conclusion in this regard is supported by a recent Ninth Circuit decision faced with ERISA plan language similar to that before the court here. *See Vizcaino II*, 120 F.3d at 1013. The issue in that case was whether employees paid through accounts payable were entitled to benefits pursuant to an ERISA plan which provided benefits to employees "on the United States payroll." The original panel hearing the case had reasoned that when accorded its ordinary meaning that provision may plausibly refer to those employees who are paid through the employer's U.S. accounts, as opposed to its foreign accounts. *See Vizcaino I*, 97 F.3d at 1194. The court also presumed that the provision could reasonably be interpreted as referring to those employees actually paid through the employer's U.S. payroll department. *Id.* Finally, the court noted that an equally plausible construction of that language may be "all persons employed [by the employer] in the United States." *Id.* at 1194 n. 8. Since the court found that the "on the payroll" was subject to alternative reasonable interpretations, it applied the doctrine of contra proferentem and construed the term against the drafter and in favor of the insured. *Id.* at 1196.

**7.** Despite Defendants' repeated use of the phrase "on Battelle's payroll," *see, e.g.,* Defs.' Mot. for Summ. J., Ct.Rec. 25 at 8, 10, the qualifying Plan language being interpreted here is "employees who are paid by U.S. . . . . payroll[ ]."

**8.** Defendants' assertion that "Tim Simmons stated Ms. McCoy was 'not in active pay status' and not on any payroll" is not supported by their

record cite. *See* Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J., Ct.Rec. 25 at 10, line 15–17 (citing Ex. A. p. 222). Rather that citation is to a letter written by Simmons which merely states that during the period of relocation, Marlene was not in pay status, but rather was being paid a mileage allowance and costs. *See* Admin.Rec. at 222.

The Ninth Circuit in its *en banc* rehearing of *Vizcaino I*, also noted reasonable alternative interpretations of the provision at issue, such as the "ought" construction—meaning the person ought to be on one of the designated payrolls and the "is" construction—meaning the person is actually on the payroll. *Vizcaino II*, 120 F.3d at 1013. However, since the *Vizcaino II* court remanded the case to the Plan Administrator in order to let the Administrator opine on the apparent ambiguity in the first instance, the above musings are but dicta. *Id.* Nonetheless, this court will heed the suggestion offered by the *Vizcaino II* court and "pay careful attention to what was said [by the court]" on this issue. *See Id.*

Accordingly, the court finds that the Plan provision "paid by U.S. . . . payroll[ ]" is subject to alternative reasonable provisions and thus is ambiguous. Therefore, pursuant to the well-established doctrine of *contra proferentem*, the ambiguity must be construed against the drafter and in favor of the insured, Marlene McCoy. *See Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 942 (9th Cir.1995).

Finally, with respect to resolving the above mentioned ambiguity, Plaintiff urges the court to also rely on the reasonable expectations doctrine. That doctrine provides that in interpreting ambiguous or exclusionary provisions in an ERISA plan the provisions must be interpreted in accordance with the reasonable expectations of the insured. *See Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 386–87 (9th Cir.1994). While in this instance reliance on the doctrine is unnecessary, it lends further support to the court's conclusion that during the pendency of her relocation trip Marlene was an "employee" of Battelle Memorial Institute who was "paid by U.S. . . . payroll[ ]"

**3. *At the time of her death, Marlene was traveling "on the business"of Battelle Memorial, as that phrase is qualified by the Plan.***

Among other hazards, the Plan insures against death which occurs while an insured is traveling "on the business" of Battelle

Memorial, subject to the qualification that the travel must be away from the premises of the policy holder in the city of the insured's permanent assignment including travel to another Battelle site. These are two distinct requirements and the court will address each in turn.

The relevant sections of the Plan provide:

***Section III—Hazards Insured Against***

> Subject to the terms of the policy, and provided such hazards arise out of and occur while "on the business of the policyholder" as defined below, the hazards insured against are all those to which the Insured may be exposed while:

> Traveling to a point or points located away from the premises of the policy holder in the city of the Insured's permanent assignment, including sojourn.

> The following qualifies the above:

> 1. coverage begins at the actual state[sic][9] of an anticipated trip whether it be from the Insured's regular place of employment, residence, or other locations. Coverage ends immediately upon return to the Insured's regular place of employment or residence, whichever occurs first.

> . . . . .

> "On the business of the policy holder" means: while on assignment by or at the direction of the policyholder for furthering the business interest of the policyholder.

> It does not include:

> a) "Commutation travel"; or

> b) any period of vacation or leave of absence of the Insured

> "Commutation Travel" means: the regular or frequent travel between residence and place of employment usual to the Insured.

> . . . . .

> ***Endorsement No: 5 (Revised)***

> . . . . .

---

**9.** A copy of the Plan in the administrative record and the SPD indicate that the word "state" is a spelling error and that the word was intended to be "start." *See* Admin.Rec. at 177.

### SPOUSE AND DEPENDENT CHILDREN COVERAGE

Coverage is hereby extended to spouses of Insureds and their unmarried dependent children[ ] who are under 23 years of age, while traveling with or in conjunction with the business travel of an Insured defined in the policy (including relocation trips) provided such a trip is authorized by and at the expense of the Policyholder....

See Decl. Lane, Ct.Rec. 26, Ex. B. In addition to the above Plan provisions, the Summary Plan Description provides in relevant part:

#### General Description—Business Travel Accident Insurance

. . . . .

The Business Travel Accident Insurance Plan provides all staff members with financial protection against covered hazards while traveling on approved Battelle business.... Commuting between home and work is not covered.

. . . . .

Benefits are provided for loss ... as a direct result of and caused by an accident during travel while on Battelle business, as long as such travel is to a place away from the premises of Battelle which are your permanent assignment **(including approved travel to another Battelle site).** Coverage begins at the actual start of the trip, whether it is from Battelle's premises or from your home or other location. The coverage terminates upon return to your home or place of employment, whichever is first.

Supplemental Decl. of Walker Ex. C, Ct.Rec. 43 at 6.

■ Pursuant to the Plan, the first requirement—being "on the business of the policyholder"—is satisfied if the Insured is either (1) traveling on assignment by or (2) traveling at the direction of the policyholder for furthering the business interest of the policyholder. The Plan clarifies further that vacation, leave of absence and commutation,

which is defined as "the regular or frequent travel between residence and place of employment usual to the Insured," are not included. Further, Endorsement # 5, which extends insurance coverage to spouses and children traveling with an Insured on business travel which is authorized and paid for by Battelle, expressly includes relocation trips within the category of business travel.

In light of Endorsement # 5, Defendants' contention that Marlene was not "on the business" of Battelle Memorial seems utterly unfounded. Not only does the administrative record clearly establish that Marlene's relocation was authorized by Battelle Columbus, but Battelle Columbus had also agreed to reimburse Marlene for the costs she incurred while on the trip, limited to lodging, meals and mileage. (Admin.Rec. at 94.) Further, she was going to Battelle Columbus to begin employment with the Battelle Columbus division of Battelle Memorial. Her trip, being necessary to her employment with Battelle Columbus and for the purpose of commencing that employment, was unquestionably a benefit to Battelle Columbus and thus satisfies the Plan requirement that the business travel "further the business interests of the policy holder." Finally, there is no suggestion in the administrative record that Marlene was on vacation or leave of absence during the time she was relocating, and she was obviously not commuting. Accordingly, the court finds that while Marlene was relocating to Battelle Columbus she was traveling at Battelle's direction and expense, she was traveling with Battelle's authorization, and her traveling was furthering the business interests of Battelle Memorial.[10] Therefore, Marlene was "on the business" of Battelle Memorial during the pendency of her relocation to Columbus, Ohio.

■ The Insured, however, must also satisfy the qualification (hereinafter "qualification") that the hazard occur while the employee is traveling to a destination away from the premises of the policyholder in the city of

---

**10.** Defendants' argument that Marlene could not have been "on the business" of Battelle because it was she who initiated the transfer and because she had a personal reason, other than employment, for wanting to transfer, is without merit.

Nothing in the Plan requires that to be covered business travel, a trip must be initiated by Battelle. Likewise, nothing in the Plan suggests that a trip which furthers the Insured's interests cannot also further Battelle's interests.

the Insured's permanent assignment, including travel to another Battelle site. Pursuant to the Plan, the insurance coverage begins at the start of the trip, whether it commences from the Insured's regular place of employment, residence, or another location and coverage ends immediately up the Insured's return to his/her regular place of employment, or residence whichever first occurs.

Here, Defendants do not dispute that Marlene was traveling to a destination away from the premises of her permanent assignment. Defendants' contend, however, that Marlene is not covered by the Plan because she cannot satisfy the above qualification that she "return" to her final destination. Thus, Defendants conclude that, since the Plan provides that coverage ends upon the employee's "*return* to the Insured's regular place of employment, or *residence* " and a relocating employee, by definition, cannot *return* to her regular place of employment or residence, relocation travel is not covered travel under the Plan. Defs.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J., Ct.Rec. 48 at 9.

Technically, Defendants are correct that a relocating employee usually will not "return" to a particular destination. Therefore, were the court faced with the question of at what point after Marlene arrived at her destination in Columbus the Plan's coverage terminated, the court would need to resolve the discrepancy caused by the Plan's use of the word "return" in the provision indicating when coverage for business travel ends. However, that issue is not before the court. Defendants nonetheless urge the court to conclude from the Plan's use of the word "return" in describing when coverage for business travel ends, that relocation travel is precluded from being covered business travel. However, that conclusion is simply untenable in light of Endorsement # 5's express inclusion of relocation trips within the category of business travel.

Moreover, Defendants' proposed interpretation of Section III, even if reasonable, would not survive the rule of *contra proferentem.* A reasonable interpretation of Endorsement # 5 and Section III read together "in an ordinary and popular sense as would a [person] of average intelligence and experience," *see Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441(9th Cir.1990), would be that

covered business travel encompasses relocation travel; if the relocation is authorized by and at the expense of Battelle Memorial. Accordingly, as ambiguities in the Plan must be construed against the drafter, Defendants' interpretation cannot prevail.

## CONCLUSION

Pursuant to the terms of the Plan, Marlene McCoy was an employee of Battelle Memorial paid through U.S. payroll during the pendency of her relocation. Further, she suffered a covered hazard, death, while traveling on the business of Battelle Memorial. Accordingly, Marlene McCoy's estate is entitled to Plan benefits. For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Ct. Rec.24) is **DENIED** and Plaintiff's Cross-Motion for Summary Judgment (Ct.Rec.31) is **GRANTED.**

The parties hereto shall confer, as soon as possible, and stipulate, if possible, as to the amount of principle coverage and interest payable under the Business Travel Accident Plan. The court will then direct entry of final judgment in that amount. If there is any disagreement as to the amount for which judgment should be entered, the parties shall so advise the court thereof and of the item(s) upon which agreement cannot be reached.

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and furnish copies to counsel.